# Court of Appeals.

*March,* 1887.

## PEOPLE v. SMITH.

### DYING DECLARATIONS.

It is the duty of the court to determine as a preliminary issue whether alleged dying declarations were made under a conviction of approaching and imminent death, and such examination may be conducted in the presence of the jury.

While the preliminary examination by the trial judge should as a general rule, be confined to the declarant's condition of body and mind at the time of the declarations, yet the extent of the inquiry by the court rests within his judicial discretion, which must determine in each case how far it is necessary to extend the examination to ascertain with accuracy and reasonable certainty the mental condition and belief of the declarant.

The court in its discretion may call for the whole conversation containing the declarations before deciding whether any of it is admissible.

The discretion of the court as to the extent of the examination as to these declarations is reviewable by the General Term of the Supreme Court but not by the Court of Appeals unless the discretion was abused and the action of the court arbitrary and without reason.

The trial judge on the present case, conducting the preliminary examination as to the condition of the mind of decedent in the presence of the jury, called for the whole conversation with decedent, which included the dying declaration sought to be introduced. The jury was sufficiently instructed that such examination was for the enlightenment of the judge, and was not evidence before them. At the close of the examination the judge caused to be read to the jury the declarations which were material and competent, directed the jury to disregard the other matters testified to during the preliminary examination, and directed that these extraneous matters should be stricken out. *Held,* no error.

APPEAL by defendant Peter Smith from a judgment of the General Term of the Supreme Court in the first department, affirming a judgment of the Court of General Sessions of New York, of 18th September, 1885, Hon. FREDERICK SMYTH presiding, convicting defendant of murder in the first degree.

11

The defendant was jointly indicted with one Alexander Sweeney, but was separately tried.

The facts in the present case given in the dissenting opinion of Judge ANDREWS, but are more fully given and discussed in the report of *People* v. *Sweeney*, 4 N. Y., Crim. 275.

*A. C. Palmer* and *Jno. O'Byrne*, for defendant, appellant.

The alleged dying declarations were testified by relations and not a word of corroboration was offered.

Hannon, the deceased, was a man at all times ready to fight at the slightest provocation.

He received his wound on April 7, and was admitted to the Hospital on that day in good condition, and remained in that condition until the morning of the 10th; his condition was good during the time that both the alleged declarations were made.

There is not a word of eviaence in the case going to show that the doctor or any other person had informed him that he would die; on the contrary, his mother, according to her evidence, told him just before he made the alleged declaration that the doctor said he would get well.

The deceased said: "Mother, lift me up, kiss me, kiss me, because I am going to die; the bullet that Pete Smith put in my head it is in it, and it will soon fetch me, and leave you without your only son." He did not say when he expected he was to die, and only used the word "soon" as expressing his idea on that subject. The deceased was a Catholic, and at this time no priest had been sent for. It is submitted that the above expression of the deceased did not make the declaration admissible.

To render the declaration of the deceased admissible on a trial for manslaughter, it must have been made by him under an impression of almost immediate dissolution, and it is not enough that the deceased should have thought that he would ultimately never recover. *Rex* v. *VanButchell*, 3 C. & P., 629.

To render a statement admissible as a dying declaration, it is not enough that it appears that the person making it was under the impression that death must ultimately ensue, but it is necessary that it should appear that the person was conscious at the time that death was actually imminent. *Reg* v. *Forrester*, 4 F. & F. 857 ; 10 Cox, C. C., 368.

Statements made behind the back of the prisoner are not admissible in evidence as dying declarations unless the person making them entertains at the time a settled, hopeless expectation of immediate death. Answers in the affirmative to the following questions: Do you think you are in bodily danger, and in fear of death? You are not expecting to recover, are you aware that you will die? Do you fully and clearly understand what I am saying to you? and the use of the expression " I am sure I am going to die," do not indicate such a frame of mind? *Reg* v. *Osman*, 15 Cox, C. C., 1. To make the declaration admissible, it must be made under the apprehension of near approaching death. *Maine* v. *People*, 9 Hun., 113.

*Randolph B. Martine*, district attorney; *McKenzie Semple*, assistant, of counsel for the people, respondents.

I. The record shows that the declarations admitted in evidence, as the dying declarations of John Hannon, were made under a sense of impending and immediate dissolution and without hope of recovery.

The question as to the sufficiency of the preliminary proofs in this case was incidentally considered and discussed by Mr. Justice DANIELS in the case of the *People* v. *Sweeney*, reported in 4 N. Y. Criminal Reports, 275. The reasoning of this learned justice is so clear and exhaustive that it will suffice to refer thereto.

II. There was no error in conducting the preliminary examination as to the dying declarations in the presence and hearing of the jury. (The elaborate argument on this head is omitted, being fully sustained and covered by the opinion of the Court.)

This precise point has been decided quite recently by the Supreme Court of Indiana. There the court says: "Counsel * * * insist * * * that the court below erred in permitting the State, *over the appellant's objections*, to introduce to the Court in the presence and hearing of the jury, its preliminary proof for the purpose of showing that certain dying declarations, which the State proposed to put in evidence, were made by the deceased while *in extremis*, and under a sense of impending dissolution; in other words, it is claimed by counsel, that this preliminary proof which was addressed to the court alone, and was not intended for the ear of the jury, ought not to have been presented to the court in the hearing of the jury, *because of its supposed injurious effect on the minds of the jurors* as against the appellant. Counsel cite no authority in support of this claim, and we know of none; and while we think *there could have been no impropriety in the court's sending the jury out during the introduction of the preliminary proof*, yet its refusal so to do does not seem to us to have constituted such an error as would authorize or require the reversal of the judgment. The objection of the appellant to the introduction of the preliminary proof in the hearing of the jury *was addressed to the discretion of the trial court*, and the action of the court in overruling the objection does not show such an abuse of its discretion as would constitute error." *Doles* v. *State*, 97 Ind., 559, 560.

FINCH, J.—We all agree in this case that no error was committed upon the trial, unless as to the single point which in the opinion of ANDREWS, J., is deemed sufficient ground for ordering a new trial. That opinion states fully and accurately the facts disclosed by the proofs, and shows that the killing was admitted, and the only issue that remained was whether the fatal shot was accidental or intentional. It further holds that, when the admissibility of the dying declarations of Hannon was brought in question, it became the duty of the court to determine, as a preliminary issue,

whether the alleged declarations were made by the deceased under a conviction of approaching and imminent death, and that such necessary preliminary examination might, in the discretion of the court, be conducted in the presence of the jury.

When the dying declarations of Hannon were offered by the prosecution, the defense objected, upon the ground that they were not such. The trial judge answered, in substance, that he could not determine that question until he knew whether or not they were made in anticipation of approaching death. The defense then claimed a right to cross-examine "upon that point." The judge answered, "Not just yet," and finally said, before the preliminary examination began, "When the district attorney gets the statements of the witness, you may cross-examine, and I will then determine whether it comes within the rule." At this stage of the case there seems to have been no room for a misunderstanding as to what was at the moment before the court. It was an issue of law, to be determined by the court upon facts addressed to it, and with which the jury had nothing whatever to do. The defense so understood it; for they sought to enter at once upon a cross-examination of the witness on that point. Everybody understood that the admission of any declarations of Hannon was stayed and barred until, upon the examination by the prosecution and the cross-examination by the defense, the issue of admissibility should be tried and determined by the court. During trial of that preliminary issue the jury stood merely in the attitude of spectators. They had no concern with it, and knew from the statement of the court that they had not. They understood that out of its result something might come before them as evidence, or nothing, and that, until the judge ruled, the facts developed were for his consideration, and not for theirs. The fact that their presence was not error shows that, in the judgment of the law, a jury must be deemed capable of that amount of discrimination at least. And thus the trial of the preliminary issue before the court was entered upon with the complete knowledge and understanding of all parties.

The district attorney proceeded at once to the precise point, and proved the statement of Hannon to his mother that he was "going to die." At the close of about one-half of a printed page directed to the issue before the court, the prosecution said: "Now we think we have laid the foundation for declarations." The judge seems not to have been entirely satisfied. The mother had given to her son the doctor's assurance that he would get well. It had produced no apparent effect at the moment; but who could tell that, if the rest of the conversation occurring thereafter should be disclosed, there might not appear a hope of recovery born of that assurance, or a spirit of hatred and revenge inconsistent with the solemn truths of statements in the presence of death? The prosecution had obtained enough for its purpose; but the court had a duty to its own conscience,—a duty not to be hasty or to be misled, and to make sure that it fully and correctly understood the frame of mind of the deceased. The learned judge, therefore, continued the examination, and at some point the district attorney apparently aided in its progress until the witness had disclosed, not a selected part, but the whole of what deceased said to her during the last two days of his life. Near its close, Hannon spoke of the influence of Sweeney with the police. The prisoner's counsel asked the court, "Will you admit this?" to which the judge replied, "I have not admitted anything yet; I want to hear the whole statement made by the deceased before I determine whether I will or will not allow the alleged dying declarations in evidence." Nothing could be plainer or more direct than this. All that had been said by the witness was thus again declared to be purely tentative and preliminary, not yet evidence in the case, and wholly directed to the enlightenment of the court in the performance of its duty. The statement, thus interrupted, was thereupon finished in a single sentence more, of about half a dozen lines. So far, no evidence of Hannon's declarations had been admitted at all. They had been repeated for the information of the court, to enable it to perform the duty of ruling

whether any, and if so what, portion of them was competent evidence to be submitted to the jury. Until some such ruling was made there could be nothing to which the prisoner could except as constituting legal error.

What followed was in some respects out of regular order. The district attorney, dropping the entire subject of the conversations with the deceased, proceeded to examine her, not upon the preliminary issue, but upon matters relating to the main issue, and belonging to the consideration of the jury. It would have been more regular to have first finished the preliminary issue. The prisoner's counsel, however, seems to have acquiesced. He had been told that he could cross-examine upon the preliminary issue when the prosecutor had finished. That time had come, and he was at liberty, if he cared for the order of the proceeding, to interpose, and assert the right which the court had promised to give him, and ask a decision of the preliminary issue before the trial proper was resumed." He did not do so. He chose to sit silent while the added proof, competent upon the main issue, was being submitted to the jury. When the district attorney closed his examination of the witness, the prisoner's counsel asked three not very important questions, and then, turning to the court, said: "I move now to strike out all the evidence given by the witness in regard to the interview with the deceased, on the ground that it is inadmissible, for the reason that the necessary foundation has not been laid for such declarations." This motion was singularly inapt, except for one purpose. As no declarations had yet been received in evidence, there were none to strike out; and the objection was to the whole of them, when some were beyond doubt admissible. If the purpose was to draw from the court the admission that they had been received, or an assent to such claim, that purpose failed, for the court said, in answer to the motion: "As I understand the position of the matter now, it is this: Mr. O'Byrne claims the right to cross-examine the witness in reference to *what will be claimed by the district attorney* as evidence of dying declarations, for the purpose of ascertaining

whether it is admissible. Are you cross-examining on that point ? " The prisoner's counsel replied : " I am not ; I am in a general cross-examination." The answer suggested to the judge the possibility of some confusion, for he at once said : " You enter on the record that the court will now permit the defendant's counsel to cross-examine the witness before passing upon the question of the admissibility of the alleged dying declarations made by the deceased to the witness as testified to by her." To this the prisoner's counsel said : " We cannot be estopped by any such record as that : it is a monstrous proposition." Why that should have been said after what had occurred, it is difficult to say. We do not mean to criticise the counsel, who bore the heavy responsibility of his client's life, or misinterpret his zeal ; but, at least, we differ from him entirely. We see in the action of the trial court a steady purpose to keep the evidence of declarations out of the case until, at a proper and suitable time it should be determined what, if any, were admissible.

The counter-effort seemed to be to insist that the court stood in the position of having admitted in evidence what it is clear was never admitted at all. The cross-examination then proceeded. Before it closed, it reverted to the declarations of the deceased, which had been repeated to the court. The witness was asked if she recollected the interview clearly ; if she thought her son was dying ; why she did not send for a priest on Wednesday ; what was the subject-matter of deceased's conversation on Thursday ; and what was the whole conversation between them. As the witness began to repeat it, the counsel closed his cross-examination. The court then asked if it was finished, and, receiving an affirmative answer, proceeded to determine the preliminary issue, and decide what portion of the statement of the witness to the court should be admitted, and directed the stenographer to read to the jury, and he did read to them, " so much and such parts thereof as are embraced within black lines," and marked on the margin, " allowed to stand as evidence of dying declarations," and ordered the balance to be " stricken

from the evidence," and, in view of what had occurred, took the added pains to caution the jury to disregard what they had heard repeated, but what the court decided it would not admit. Upon this state of the facts I cannot resist the conviction that the declarations of Hannon now objected to were never admitted in evidence, but wholly excluded; and that the case is not at all one in which erroneous proof was first admitted, and then sought to be stricken out, but one in which no error of admission existed which required correction. It seems sufficiently evident, also, that any doubt on the subject, and any confusion or mistake as to what was being done, was steadily and persistently guarded against by the court, and the admissibility of the proposed evidence determined as soon as it could be done consistently with the right of cross-examination reserved to the defense.

Since there could be no valid exception to the admission of evidence which was never admitted, the only possible inquiry becomes whether the action of the court in acquiring the needed information on which to rule is itself the subject of our review. We do not see how it can be. It rests in the judicial discretion. It never goes to the jury except so far as admitted. Some means of information the court must have. The suggestion made is "that it should have confined the preliminary examination to the facts relating to the declarant's condition of body and mind at the time." That proposition, stated as a general rule for the guidance of trial judges in exercising their discretion, need not be doubted; but the inquiry will remain in each case, under its own peculliar circumstances, how far the examination should extend in order to ascertain with accuracy and reasonable certainty the mental condition and belief of the declarant. The exercise of that discretion was reviewable by the general term, but is beyond our jurisdiction, unless we can see that such discretion was abused, and the action of the court arbitrary and without reason. We cannot say that. There was a motive that might fairly have operated upon the judicial mind to push the inquiry beyond the point at which the district at-

torney paused, and that motive was, as we have already sug-
gested, to ascertain whether the assurance of survival which
the deceased had been told the doctors had given, became at
any time so operative upon him as to awaken a hope of life.
With that circumstance before it, the court might reasonably
conclude that a part of what was said would scarcely furnish
as safe a basis of judgment as the whole.    We can readily
see that the determination of the court to hear all that the
deceased said, before deciding whether any of it was admis-
sible, should not be deemed arbitrary or an abuse of discre-
tion under the existing facts.

Suppose that it had turned out, as from what appears
seemed quite possible, that the very last thing said by Han-
non, relating not at all to the facts of the shooting, had
shown the presence of a lurking but confident hope of recov-
ery. Singularly enough, the prisoner's counsel illustrates
the force of what we are saying by claiming in his able brief
precisely such a result. He plants himself on the very last
words of Hannon, which closed the conversation with his
mother, and which were about Sweeney and the police, and
argues that they show a hope of recovery.    Hannon said:
"I am afraid, mother, you will get no satisfaction for your
son." She replied: "Johnny, that can't be so." He an-
swered: "I hope so, mother, because I would like to go
agin them fellows." The counsel claims that the expression
does bear somewhat upon Hannon's frame of mind, and yet,
without what preceded it, its occasion, and even its accurate
meaning, might be lost to us. It does not appear to have been
deemed sufficiently material by the learned trial judge to
have affected his judgment; but he could not have known
that in advance; and it is easy to see that it might have
assumed a form which would have been very material.    The
hope of survival, the lingering belief that death is not ine-
evitable, may disclose itself to an observant mind where even
the witness does not see it, and may come to the surface
when the talk is far away from the facts of the killing, and
from the *res gestæ*.    The suggestions show that the action of

the court was, at least, not arbitrary, and without some apparent reason, and so its discretion was not abused. The general term, which had the power to review it, has held that the rights of the prisoner were not prejudiced, and its conclusions must therefore prevail.

The judgment should be affirmed.

RUGER, C. J., EARL and DANFORTH, JJ., concur. ANDREWS, J., reads dissenting opinion for reversal, and PECKHAM, J., concurs. RAPALLO, J., absent.

ANDREWS, J., (dissenting.)—The defendant was jointly indicted with one Alexander Sweeney, in the court of general sessions in the city of New York, for the murder of John Hannon, by shooting with a pistol, April, 1885. He was eparately tried, and was convicted of murder in the first, degree. The transaction took place at about 6 o'clock in the evening, at a shanty at the foot of Thirty-eighth street in the city of New York, where the deceased was employed as a watchman in the street-cleaning department. The deceased was at the time sitting or lying on a bench in the shanty and a man named Tracy was in the room, sitting by and leaning upon a table. Tracy saw Smith and Sweeney enter the door, and he pretended to be asleep. He testifies that they had some conversation in a whisper, whice was followed almost immediately by the report of a pistol, and they then turned and left the place. Tracy, seeing that Hannon was shot, followed the two men, and pointed them out to officers, who arrested them. The shooting was done on Tuesday evening. Hannon was taken the same evening to Bellevue Hospital, and died there the Saturday following. It was found that a ball had penetrated the skull over the right eye, entering the brain. There was no controversy on the trial that the shot proceeded from a pistol in the hands of defendant. The defense was that the shooting was unintentional and accidental. The testimony of the defendant, who was sworn as a witness in his own behalf, tended to support this explanation.

The theory of the prosecution was that it was a deliberate and premeditated murder, committed by Smith and Sweeney, acting in concert, from enmity, each having a grudge against the deceased. The prosecution, in support of this theory, proved that Smith and Sweeney had known each other from boyhood, and were intimate friends, and were also acquaintances of the deceased. For the purpose of showing the hostility of Sweeney to the deceased, the prosecution was permitted, against the objection of the defendant's counsel, to show that a fight had occurred between them on the day before the homicide. It was also shown by the evidence of the mother and sister of the deceased that, about two years prior to the homicide, an altercation took place between the defendant and the deceased, during which the former drew a pistol, and that on that occasion the defendant threatened to kill Hannon, "if it is twenty years to come."

The people, further, to support the indictment, offered evidence of declarations made by the deceased to his mother at the hospital on Wednesday morning, the day after the shooting, and also to his sister on Thursday morning. The principal and serious allegations of error relate to this evidence—*First*, as to whether the declarant made the declarations under a sense of impending death, within the rules governing the admission of dying declarations; and, *second*, whether the court committed a legal error in permitting declarations of the deceased to be proved in the first instance, not relating to the immediate circumstances of the death, and which the court subsequently ordered to be stricken out.

In respect to the first question, viz., whether the deceased at the time of making the declarations was in such condition of body and mind, and had such a sense of impending dissolution, as to make his dying declarations admissible as such, we entertain no doubt. As the sequel proved, he had received a mortal wound. His conversation with his mother indicated that he considered his condition hopeless. He said: "Yes, mother, I am shot. Mother will you take me home? The Bellevue people are good. They are good enough; but they

can do nothing for me." The mother said : " Johnny, the doctor don't say so ; the doctor says you will get well." He said: " Mother, lift me up ; kiss me, kiss me, because I am going to die. The bullet that Pete Smith put in my head, it is in it, and it will fetch me, and leave you without your only son." There was other conversation not necessary to repeat. Suffice it to say that all his statements as to his condition indicate that, both on Wednesday and Thursday mornings, he had a settled conviction that he was fatally wounded, and that, death was imminent.

It would not be profitable to go over the cases as to the preliminary proof necessary to entitle dying declarations to be given in evidence. Each case differs in its circumstances, and the cases are not all reconcilable. The rule admitting dying declarations is anomalous, and courts are strict in requiring that, before admitting them, it shall be made clearly to appear that the declarant was in fact resting under the shadow of death from the fatal stroke, and so believed, entertaining no hope of recovery. The circumstances proved in this case bring it within the rule according to the best-considered authorities. *Reg.* v. *Howell*, 1 Car & K., 689 ; *Reg.* v. *Reany*, 26 Law J. M. Cas., 43 ; *Reg.* v. *Jenkins*, 11 Cox, Crim. Cas., 250 ; *Reg.* v. *Peel*, 2 Fost. & F., 21 ; 3 Russ. Cr. (4th Eng. Ed.), 250 *et seq. ;* 1 Greenl. Ev. *c.* 9.

The more serious question arises in respect to the alleged error of the court in admitting declarations made by the de- ,ceased in relation to matters not the proper subject of proof by dying declarations. The course of the trial upon this point, as disclosed by the record, was this: The mother of the deceased, on being called and sworn as a witness for the people, was asked by the prosecuting attorney to state the conversation she had with the deceased at the hospital on Wednesday morning. The defendant's counsel interposed an objection that it was not " in the nature of an *ante mortem*, and was inadmissible." The court replied, " I cannot determine whether it is or not till I hear it." On the defendant's counsel repeating the objection, the court stated ; " Mr.

Palmer, rather than you should interrupt at every question put to the witness, you may consider an objection and exception to every question put to the witness." The witness was again asked to state the conversation, when the defendant's counsel asked the court if it had decided to admit declarations of Hannon when not in fear of imminent death, and the court replied that it had not, adding : " How do I know as yet but that they were made in anticipation of immediate death ?" The defendant's counsel then asked to be permitted to cross-examine the witness on that point ; but the court denied his request, saying that when the district attorney got the statement of the witness the defendant's counsel could then cross-examine, and the court would decide whether it came within the rule ; and to this ruling an exception was taken. The district attorney then proved by the mother the declarations of the son heretofore stated, and said : " Now I think we have laid the foundation for declarations." The court then took up the examination of the witness, and she proceeded, in answer to the questions of the court and the district attorney, to give testimony occuping four printed pages of the case, narrating the whole conversation with her son. Much of the evidence was elicited by answers to the specific questions as to declarations having no relation to the *res gestæ* of the homicide.

After an examination of the witness covering 20 printed pages, embracing many subjects other than the interview at the hospital, the court directed the stenographer to read to the jury from his stenographic notes a part of the evidence of the witness pointed out by the court of the conversation with her son, which embraced the evidence which has been detailed, showing Hannon's expectation of death, and also his declarations as to the circumstances of the murder, and directed that the further evidence of the witness of what transpired at the interview should be stricken out and disregarded by the jury. The portion of the evidence directed to be read to the jury is inclosed in black lines in the error book, and occupies about a printed page of the testimony of the witness. Fol-

lowing the testimony admitted, is the testimony stricken out, which occupies three printed pages.

In the testimony stricken out is the following: To a question by the mother. " Johnny, what did they shoot you for?" The deceased replied, " Very little cause, mother; but Pete Smith has promised me this for a long time." To another remark by the mother, " Johnny, how early they went down to shoot you," he replied, " That was their best chance. mother, because the carts never came in with their first loads before seven or half-past seven in the evening. Smith and Sweeney knew the time the loads came in just as well as I did; they thought they would catch me alone." The mother asked : " How came Tracy to be with you, Johnny?" He answered : " Because I asked him to remain with me all night. I was afraid. I asked Tracy to stay with me. He said he would stay. I asked William Curry to remain with me the night before. He also did stay. Mother, I think I would get shot Tuesday morning only for having William Curry with me." The mother asked : " Johnny, why do you think that?" He replied: " Because Sweeney and another man came down in the morning between five and six, I think it was."

The particulars of the interview between Sweeney and deceased on Tuesday morning, as related by the latter, were then called out by specific questions by the district attorney. It appeared from his statement to his mother that Sweeney called the deceased out of the shanty, and Sweeney said : " What talk have you had about what you can do to me and Smith ?" The deceased replied : " I have no talk about what I can do to you." Sweeney then called him a liar, and on the deceased saying, " If you want any more satisfaction, I am man enough for you, if I only get fair play," Sweeney said, " We will not mind it now ; we will have another time to fix this." Further declarations of the deceased were proved to the effect that Sweeney and Smith had relatives in the police force, who would be able to prevent the mother " getting any satisfaction for her son."

We are of the opinion that the court committed a legal error, under the circumstances, in permitting proof of declarations of deceased in respect to facts not coming within the class of facts which may be proved by dying declarations, and that the error was not cured by striking these declarations from the record, and directing the jury to disregard them. There is no doubt of the proposition stated by the counsel for the people, that the question whether circumstances exist which make declarations admissible as dying declartions is a preliminary fact to be determined by the court, and that it cannot be left to the jury to say whether the deceased thought he was dying or not ; for that must be decided by the judge, whose decision is reviewable on error, before he permits the declarations to be given in evidence. This was decided at a conference of all the judges of England in 1790, and has been generally accepted as the rule in this country. 3 Russ. Cr. (4th Eng. Ed.) 266, and cases cited : *Donnelly* v. *State*, 26 N. J. Law, 463 ; 1 Whart. § 681. It is a necessary result of this doctrine that the court must in the first instance hear the evidence bearing upon the condition of the declarant, and his sense of impending death. If on this inquiry the court determines that the circumstances justify the introduction of dying declarations, then on their being offered, the question whether they relate to facts which may be proved by dying declarations arises, and is to be determined by the court in the ordinary way.

It is also well settled that dying declarations relating to transactions prior to the homicide, and not a part of the *res gestæ* are not admissible. The rule is stated by ABBOTT, C. J., in *Rex* v. *Mead*, 2 Barn. & C. 605, in language often quoted with approval, "that evidence of this description is only admissible where the death of the deceased is the subject of the charge, and the circumstances of the death the subject of the dying declaration." 1 Greenl. Ev. § 158 ; *People* v. *Davis*, 56 N. Y., 95 ; *Insurance Co.* v. *Mosely*, 8 Wall. 397. The declarations of Hannon, to which we have referred, which were stricken out by the court, were clearly inadmissible

under the rule, and were calculated seriously to prejudice the defendant. They supplemented with great force the evidence tending to show concert, deliberation, and premeditation. We think it was the duty of the court to have confined the preliminary examination to the facts relating to the declarant's condition of mind and body at the time.

The whole examination was taken before the jury in the ordinary manner of taking testimony on the trial of an issue. It was, we think, the duty of the court, in fairness to the prisoner, and that a discreet administration of the criminal law required the court, to have called the attention of the witness, on the preliminary inquiry, to the particular point to which the inquiry was directed, and not to have permitted her to testify to declarations, not only irrelevant to the preliminary fact, but inadmissible on the main issue. The court not only omitted to call the attention of the witness to the point, but refused to permit the defendant's counsel to examine her on the preliminary question until after the examination of the district attorney, covering the whole interview, had been concluded. The testimony stricken out was received after all the testimony admitted bearing upon the preliminary inquiry had been elicited. The part stricken out was evidence received subsequent to the evidence retained. It might happen that a witness called to testify to dying declarations might, on the preliminary examination, through ignorance or want of discrimination, intermingle declarations as to the condition of the deceased with declarations relating to the crime. Such prejudice as the defendant might suffer in such a case he would have to bear as an unavoidable incident of the trial. But that is not the case.

We think the judge erred, and that, according to the suggestion of the court, made to counsel on trial, an exception must be deemed to have been taken to the objectionable evidence, and we think it quite clear that the error was not cured by striking it from the record, and instructing the jury to disregard it. *Erben* v. *Lorillard*, 19 N. Y., 299 ; ALLEN, J., *Linsday* v. *People*, 63 N. Y., 154 ; *Furst* v. *Second-Avenue R. R.*, 72 N. Y., 542.

The judgment and conviction should therefore be reversed and a new trial granted.

PECKHAM J., concurs.

Judgment affirmed.

NOTE—In a note to the case of *People* v. *Evans*, 4 N. Y. Crim. 221 *n.*, the leading cases on dying delarations are given.

In addition to these there mentioned a few others are here given.

"Mrs. Tallent was also permitted to testify that after her husband was shot he said to her ' Oh, Hun, he has killed me,' or ' Oh, Hun, he has shot me. Pray for me, Oh! my children!' This was after he had gone about two hundred yards from the place where he was shot and called her, and she went to him, traveling about one hundred yards. It was not admissible as part of the *res gestae*. 1 Greenleaf, Ev. 108 and notes. It was not admissible as a dying declaration. She does not state positively what the exclamation of the deceased was. It was, as she states, either ' Oh! Hun, he has killed me ' or ' Oh! Hun, he, has shot me, * * * If his exclamation was ' Oh! Hun he has killed me,' that, taken in connection with the nature of the wound and the short time which elapsed after he was shot before his death, would show that he was ' under a sense of impending death ' but if the exclamation was ' He has shot me,' there is nothing to show that he made this statement ' under a sense of impending death,' nothing to show that although the wound was necessarily fatal, he was so impressed." *State* v. *Rider*, (Mo.) 6 West. Rep. 458; 1 South Western Rep. 825.

The dying declaration that " he shot me down like a dog " is not a conclusion, but merely intended to illustrate the lack of provocation and the wantonness with which the defendant did the act. It was a statement of a fact by way of illustration. *State* v. *Saunders* (Or., Dec. 1886), 12 Pacific Rep. 441.

Repeated declarations of the deceased that the accused was his murderer, made with the full knowledge that he could live but a few hours, are admissible. *Marcum* v. *Commonwealth* (Ky. Nov. 1886), 1 S. W. Rep. 727.

It is error to instruct the jury that a dying declaration should receive the same degree of credit as if made under oath at the trial. *State* v. *Matthes*, (Mo. Jan. 1887) 2 South Western Rep. 800; 7 West. Rep. 737.

Where a dying declaration is admitted in evidence, it is error to refuse to admit testimony that the deceased had no religious belief, and rejected all belief in future rewards and punishments, *Hill* v. *State*, (Miss. Feb. 1887), 1 Southern Rep. 484. *Goodall* v. *State*, 1 Or. 333; 80 Am. Dec. 396.

It is not necessary to render dying declarations admissible that the declarant therein be in a situation to give a full and complete account of all the facts of the transaction, if he states the facts distinctly as far as he goes, and it does not appear that the facts stated were designed to be connected with others which were to form a full and complete account of the transactions. *Vass* v. *Commonwealth*, 3 Leigh, (Va.), 786, 24 Am. Dec. 695. And the declarations may have been elicited by leading questions. *Id.* The consciousness of approaching death need not be expressed,

it may be inferred from circumstances. *Anthony* v. *State*, Meigs, (Tenn.), 265; 33 Am. Dec. 143, and cases cited; *McDaniel* v. *State*, 8 Sm. Mars. (Miss.), 401; 27 Am. Dec. 93.

And as to the dying declarations in the principal case, see *People* v *Sweeney*, 4 N. Y. Crim. 275, already referred to.