THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* SARA B. CHASE, Appellant.

*Dying declarations — their admissibility depends on the facts of each case.*

To render dying declarations admissible in evidence it is not sufficient to show that the declarant believed he was about to die, but it must also be proved that he was at the time without any hope of recovery ; the fact that the declarant lived nearly three days after the making of the declaration would have little effect in determining the question as to the admissibility of such declarations.

It is not necessary that any specific words or phrases should be used by a declarant, exhibiting his condition of mind, in order to render a dying declaration admissible in evidence; the condition of mind of the declarant must be established by the facts and circumstances which surround each individual case.

(PARKER, J., dissenting, on the ground that the facts in this case did not show such condition of mind.)

APPEAL by the defendant, Sara B. Chase, from a judgment of the Court of General Sessions, held in and for the county of New York on the 14th day of June, 1893, convicting the defendant of the crime of manslaughter, and also from an order entered in said clerk's office denying the defendant's motion for a new trial.

*J. E. Graybill,* for the appellant.

*John D. Lindsay,* for the respondent.

VAN BRUNT, P. J.:

We entirely agree with the rule laid down by Mr. Justice PARKER in his opinion governing the admission of dying declarations. But we do not think he gives sufficient force to the testimony showing the condition of mind of the deceased at the time of making the declaration, the admission of which is considered fatal to the conviction in the case at bar. We think that had death followed quickly after the making of the declaration in question no doubt could possibly have arisen but that the witness showed that condition of mind in the deceased which justified the court in admitting as evidence a dying declaration. But the fact that the deceased lived nearly three days after making the declaration naturally raises a doubt which otherwise would not have existed. Under such circumstances it does not seem so certain that the declaration was made under the shadow of impending dissolution as where death follows speedily thereafter. This, however, should have but little effect in determining the question as to the admissibility of the declaration. It is the condition of mind of the declarant which determines that question. If it appears that the declarant is conscious of impending death, and without expectation or hope of recovery, even if the final event is postponed longer than had been anticipated, such postponement in no manner affects the condition of mind of the declarant at the time of the making of the declaration; nor is the situation of the declarant less solemn and awful, nor is every motive to falsity less completely silent. We think, therefore, upon a consideration of the testimony in question, that at the time the declarant made the declaration which is the subject of criticism upon this appeal it appeared conclusively that she believed her situation hopeless; that she believed that death was at hand, and that she was without expectation or hope of recovery.

It is not necessary that any specific words or phrases shall be used by the declarant to exhibit the condition of mind requisite to make a dying declaration admissible. But the question to be determined is, was the court justified in believing, from the nature of the evidence, that her condition of mind was such as the rule which we have approved requires? Therefore, in different cases there are variations in the situation and changes of expression, and hence no fixed or absolute standard or formula can be established; but the question of the condition of mind must be determined by the facts and circumstances which surround each individual case.

In the case at bar the evidence upon which the dying declaration was admitted was the testimony of the mother of the deceased, who naturally was agitated because of the impending death of her child; and it is not strange that she was not able to be absolutely certain in regard to the phraseology which was used by her daughter in connection with the dying declaration indicating her state of mind. But the fact that she was not certain of the precise language that was used does not, in our judgment, detract from the value of her testimony, but rather impresses us with the idea that the witness was not willing to make her statement any more exact than her absolute recollection required. But, although she may not have been certain of the precise words which were used by her daughter, it is evident that she honestly gave the substance of that which the daughter said, and that that substance indicated that the daughter knew that she had to die, and that there was no hope of her recovery. This being the deduction which, in our opinion, may not only properly, but must inevitably be drawn from an examination of this witness' testimony, we think the dying declaration was admissible.

We feel all the force of the argument that death did not follow speedily after the making of this declaration, but it appears from the evidence in the case that both the mother and the daughter did not know but that the next minute death would occur. It seems to us, therefore, that the declaration was made under the circumstances which the law requires in order that it should be admitted in evidence against a defendant charged with crime.

The judgment should be affirmed.

FOLLETT, J., concurred.

PARKER, J. (dissenting):

Formerly it was the rule that declarations were admissible as dying declarations if made when *in extremis* and under sense of impending dissolution. Later, the conclusion was reached by the courts that the mere sense of impending death did not constitute such a guaranty of truthfulness as to warrant an omission of the oath and cross-examination.

This conclusion found expression in *Woodcock's Case* (1 Leach, 502), Lord Chief Baron EYRE asserting "that the only state which could safely be accepted as sufficient to render the declarations admissible is the state in which every motive to falsehood is silenced and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice."

An examination of *People* v. *Smith* (104 N. Y. 491–502) and of the authorities collated in a note to *People* v. *Evans* (4 N. Y. Crim. Rep. 218) makes it apparent that the rule is authoritatively established that to render dying declarations admissible it will not suffice to show that the declarant believed he was about to die, but it must also be proved that he was at the time without any hope of recovery.

Judge ANDREWS, in *People* v. *Smith* (*supra*), stated the rule as follows: "Before admitting them it shall be made clearly to appear that the declarant was in fact resting under the shadow of death from the fatal stroke, and so believed, entertaining no hope of recovery."

Whether declarations are made under circumstances which entitle them to be received in evidence under the rule stated presents a question which the court has to consider and determine.

It is not bound to follow blindly the statement of a declarant that he believes he is about to die and is without any hope of recovery. If the other facts proved convince the court that he did at the time have such hope, notwithstanding he went through the formality of saying he did not, the declarations could not be received.

Neither is it necessary that the declarant should say in so many words, "I believe I am about to die, and I am without any hope of recovery," in order to entitle the declarations to be received in evi-

dence. It is sufficient if his conduct and his statement, considered together, are of such a character as should convince the court that, at the time of making the declarations, the declarant believed that he was about to die, and that from him all hope of recovery had departed.

When in the progress of the trial the district attorney had reached the point where he was prepared to introduce in evidence what he claimed to be the dying declarations of Miss Manzoni, the court gave the jury a recess in order that a preliminary examination might be had in their absence which should enable the court to pass upon its admissibility.

This action was wisely taken for the purpose of preventing any injustice resulting to the defendant, in the event that the evidence offered on the part of the People should not be admissible.

The witness called for that purpose was Eliza Biggert, the mother of the dead girl. In response to some of the questions put by the district attorney she said : " Q. What did she say? A. She said, ' Mamma, I believe I am going to die ; I would like to live to show you what a good girl I could be, but I won't have the chance.' The Court : Q. You were alone with your daughter at the time ? A. Yes, sir. She said : ' I know I shall die. Donovan, mamma, Florence Donovan, has been the cause of my trouble. He wanted me to have an operation performed, and get rid of the child. First, I went to Mrs. Diemer's. She operated on me three times, and then she sent me to Mrs. Chase. She operated on me once, and the baby was born. Florence Donovan's reason for wanting me to do so was that he couldn't support me and give me as good a home as I had, and he gave me the money to get rid of the child.' There is something else : ' When he first knew, when Florence first knew, of my condition, he was to marry me and take me away, and so deceive the public, if the child lived, as to the age of it ; when he came home he had lost his position or was about to lose it. Then he said that he had lost his position and could not take care of her.' The Court : Q. Or was about to lose it ? A. Yes, sir ; and was about to lose it. Q. Now, which do you mean to make it, madame ? A. That he was about to lose it, but hadn't yet at the time. Q. That he was about to lose his position, and could not take care of her at the time ? A. No, sir. Q. Then I will take it out ; that he

had lost his position? A. Yes, sir; and it was his suggestion then that she had the operation performed. Q. Now, you are quoting her, are you? I know it is hard work. A. Yes, sir; it is hard work. District Attorney: Q. Now, have you stated all that Maggie said that you recollect? A. No, sir; I think I haven't."

On cross-examination she testified in part: "Defendant's Counsel: Q. Was not your daughter at the time in regard to which you have just testified in a very weak condition? A. No, sir; she was very strong. When she was dying she sat right up in the bed and reached over like this (illustrating) and took hold of the mantelpiece, and raised herself right up in a sitting position and was in a sitting position until she died. The Court: Q. And that was some time after that she died? A. Yes, sir; that was on the 10th, and she died on the 13th. Q. Could you tell that as indicative of her strength at that time? A. Yes, sir; she was very strong. Defendant's Counsel: Q. Well, on that Friday she seemed pretty strong? A. Yes, sir; so strong that she could get out of bed if we would let her, herself. Q. Did you notice any remarks made by your daughter which would ordinarily be termed flighty during the period immediately preceding this declaration? A. No, sir; I don't know as I did. At times if she woke up she might talk a little, but when you questioned her she was just as bright as she could be. She understood everything and knew everything. Q. Didn't she talk rather at random at times? A. Sometimes. Q. Immediately around this period? A. No, sir; no more at that period, nor as much as toward the last. As she grew nearer her death she seemed to grow clearer. Q. Did she talk about any subject in a desultory way? A. No, sir. Q. Did she state to you that she had absolutely no hope of recovery? A. Yes, sir; she did. Q. Then, when you stated that you had given all that she said, that was not the case — she said more, then? A. She did, sir. Q. When you stated, in giving her declaration, that you had given it all, she still said this, which you have not given? A. I think I said that; didn't I? The Court: Q. No; did she use those very words? A. Yes, sir. Q. That she had no hope of recovery? A. Yes, sir. Q. Did she use the words 'hope of recovery?' A. No; she said: 'Hope of getting well.' Q. Then she didn't say that she had no hope of recovery? A. No,

sir; I supposed it meant the same thing. Q. No; we want her exact words. She said that she had no hope of getting well? A. Yes, sir. Q. And did she use the word 'hope?' A. Yes, sir; I am sure she did. Defendant's Counsel: Now, are you absolutely sure that she made use of that expression? A. She did; she said that; but she might have said it in a little different words. The Court: Q. Now, that is what we want. If it was in different words, counsel is entitled to them? A. I think I did say before what she said, that she hoped to get well, but she believed she would not get well. I think those are the words that I used. She had no chance I believe — no chance. The Court: Q. Then you don't say that she said 'hoped?' A. No, sir; 'no chance to get well;' that is it. Defendant's Counsel: Q. Then you now change the wording of the declaration as heretofore given by you? A. I don't know; I don't know whether I change it or not. Q. You change it now, in accordance with your last answer? A. I don't know that I change it; I forget what I said before. Q. Very well; what did she say in regard to her hope of recovery? Now, the exact words? Don't answer the question immediately, but think and give us the exact words that she said? A. She said that she would like to recover. 'I would like to live, but I know I can't live,' or 'I have no —' just let me think a moment — 'but I know I can't.' I think that was the word. Q. Then you are not sure as to the exact words? A. I will remember it in a minute or so. I will think. She said, 'Mamma, I would like to live, but I know I can't live, to show you what a good girl I could be yet.' Q. Did she say that she expected to die then? A. Yes, sir; that she knew she couldn't live. Q. Did she say how long she expected to live? A. No, sir; no one could tell that. Q. She didn't make the statement, then, to you with death immediately staring her in the face? You were not under the impression that she was going to die as soon as she uttered the words? A. Well, I was under the impression that she would die at any minute. Q. Well, was she under that impression, from your conversation? A. Well, I think she must have been, or she couldn't speak like that. She wouldn't make use of that if she didn't think so. Q. Well, she didn't say anything that indicated that she expected to die immediately? A. Well, she didn't give me the minute or the hour. She said that she believed that she would

die. Q. That she could not live? A. Yes, sir. Q. She didn't say that she had no hope of recovery? A. No, sir; I don't believe that she said that. Q. She didn't say when she expected to die? A. No, sir; I don't think she could say that. Q. Did I understand you to say that, at this time, she could get up and go around the room? A. If we let her; she was so strong; she was so strong up to the very last."

The trial court, at the close of the examination, ruled that the declarations were admissible, and having in mind that experience induces appellate courts to appreciate the superior opportunities afforded to a trial court for rightly passing upon the sufficiency of preliminary proof, I have reached a different conclusion only after careful consideration and consultation.

I am unable, after reading the evidence, to say that I am convinced that Miss Manzoni had no hope of recovery when she made the declarations to her mother.

It is true that she said, " Mamma, I believe I am going to die; I would like to live to show you what a good girl I could be, but I know I won't have the chance."

The tone of voice and accentuation with which this sentence was delivered would not unlikely have enabled the listener to determine whether she was wholly without hope of recovery. But neither the trial court nor this court had any assistance of that character. Those words could well be spoken by one dreading and fearing a fatal termination, and yet having hope that her usual good health and strength of body would enable her to pass the crisis safely.

It does not appear that prior to that time she had been told by any one that there was no hope for her. Indeed, it does not appear that she had been warned that the result of her illness might prove fatal. It appears from the mother's answers on cross-examination that at the moment of making the declarations she was " very strong — so strong that she could get out of bed if we would let her herself." This was three days before her death, and from that time until almost her last hour her physical strength seems to have been remarkably well sustained.

Is it likely that one so young and strong, without warning from any source, would abandon all hope? Possibly; but it will not be presumed; it must be proved. Instead, we find the witness testify-

ing that " she said that she hoped to get well, but she believed that she would not get well," a statement which would have been sufficient under the old rule, as we have observed, but wholly inadequate to meet the requirements of the one now established and rigorously enforced by the courts.   Other portions of her testimony, it is true, tended to show that she could not recall that her daughter had said that she hoped to get well.   But the fact that she contradicted herself in that and other respects does not tend to strengthen the confidence of the court in her testimony, upon which the People solely relied as a foundation for the admission of the declarations so far considered.

This is said in no unkindness, for it is easy to understand that a grief-stricken mother would not be able to accurately recall the words of her child, delivered under the circumstances surrounding the interview about which she testified.   Especially so, when at the time she did not appreciate the necessity of carefully treasuring up every word and act, in order that ultimately they might tend to subserve the ends of justice.

I advise a reversal of the judgment,

Judgment affirmed.