THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CHARLES FLAHERTY, Appellant.

Fourth Department, November 9, 1926.

Crimes — manslaughter first degree — defendant was charged with administering drugs and medicines and using instrument on woman for purpose of procuring miscarriage, from which death resulted — evidence does not support charge as to use of medicines or drugs — defendant was not represented on trial by attorney — two physicians testified that death was result of septic peritonitis and that condition was caused by attempted operation — said testimony was improperly admitted since neither physician gave facts on which opinion was based nor was testimony given in answer to hypothetical question based on facts assumed to be true — testimony by mother of decedent as to statement by decedent was hearsay — said statement was not dying declaration since testimony did not show that decedent anticipated death — evidence of statements cannot be overlooked under Code of Criminal Procedure, § 542 — fact that motion was not made to strike out evidence does not prevent Appellate Division from considering same.

On a prosecution for manslaughter in the first degree, based upon the death of a woman alleged to have been caused by the defendant through the administration of drugs and medicines, and through the use of an instrument with the intent

to procure a miscarriage, the evidence does not sustain the charge that the defendant used medicines or drugs designed to procure or which did procure a miscarriage.

The testimony by two physicians, one of whom saw the decedent just before she died, and both of whom assisted in performing an autopsy, to the effect that septic peritonitis, which caused the death, was caused by an attempted operation to terminate pregnancy, was improperly admitted, since neither physician gave any facts on which the opinion could have been based, nor did they give their opinion in answer to a hypothetical question based on facts assumed to be true, and, furthermore, both physicians testified that the septic condition might have been the result of any one of several causes.

It was error to admit testimony on the part of the mother of the decedent to the effect that the decedent told her, shortly before her death, that she had been operated on in defendant's house and that she had been in defendant's house all the time she was away, for that evidence was merely hearsay, the statement not having been made in the presence of the defendant.

Furthermore, said evidence was not admissible as a dying declaration, since the witness testified that the decedent did not believe that she was dying at the time the statement was made and did not anticipate death within a short time.

The Appellate Division will not overlook the error, under the authority of section 542 of the Code of Criminal Procedure, on the theory that defendant's rights have not been prejudiced, for the evidence in this case of defendant's guilt is based largely on the fact that he may have had the opportunity to commit the crime, and the testimony in question was very important in that connection and, therefore, the error was prejudicial.

The defendant was not represented on the trial by an attorney, and, therefore, the contention by the district attorney that no motion was made to strike out said evidence cannot be sustained, for it is the duty of the appellate court, especially under the circumstances of this case, to consider the entire case whether or not proper objections or motions were made by the defendant.

APPEAL by the defendant, Charles Flaherty, from a judgment of the County Court of the county of Livingston, rendered on the 8th day of April, 1926, convicting him of the crime of manslaughter in the first degree.

*Sebring & King* [*James O. Sebring* of counsel], for the appellant.

*Austin W. Erwin, District Attorney,* for the respondent.

CLARK, J. Defendant has been convicted in Livingston county of the crime of manslaughter in the first degree. He was charged with causing the death of one Clara Hagan, which resulted from a criminal operation, alleged to have been performed on the person of said woman by defendant for the purpose of procuring an abortion. (See Penal Law, §§ 80, 1050.)

The indictment charged that to accomplish this result defendant supplied and administered to the young woman drugs and medicines, and that he also used an instrument on said Clara Hagan with intent to procure a miscarriage, and that she died from the effects of such treatment.

There is no evidence that defendant ever prescribed or adminis-

tered medicines or drugs designed to procure or which did procure a miscarriage. The only medicine that defendant is shown to have prescribed or administered was diluted tincture of digitalis, which is a heart stimulant and which was prescribed for her as such.

If this judgment stands it must be under the charge that defendant used some instrument on this young woman to procure a miscarriage, and that from the effects of that operation she lost her life.

The defendant is not a lawyer, but nevertheless tried his own case. Experienced counsel had been retained to conduct his defense, but when the case was moved for trial his counsel was not present and the trial proceeded.

Under the circumstances it is our duty to inquire carefully into the proceedings at the trial to see if this man, charged with a serious crime, and attempting to conduct his own case without the aid of counsel, was accorded that fair and impartial trial to which he was entitled under our system of administering the criminal law.

It was the theory of the People that Clara Hagan, a young woman some twenty-two years of age, died as the result of a criminal operation performed upon her by defendant at his residence in the village of Mount Morris sometime between the 12th and 19th days of January, 1926.

The evidence shows that the defendant was an old acquaintance of Clara's family and that some weeks prior to her death she and the young man charged with being the author of her condition, and her mother, called on defendant at his residence and asked his advice in the circumstances, and that defendant advised the young people to get married, which the young man was willing to do, but which proposition was not favorably received by the young woman. Defendant then advised that Clara go to some institution where she could be cared for. That suggestion was agreeable to the parties and the young man agreed to pay the expenses and did subsequently leave money with defendant for that purpose.

Defendant contends that on the morning of the 12th of January, 1926, Clara came to his residence and he turned over to her the money that had been left with him, as above stated, to defray her expenses; that after receiving this money she left defendant's house and was accompanied to the train by a Mr. Wheelock, who testified that he went with the young woman to the train and saw her board a west-bound train going to Buffalo on the morning of January twelfth.

Defendant further contends that he did not see Clara again until the evening of January 18, 1926, when she returned to his residence;

that he attempted to communicate with her family that evening by telephone but was unable to do so, but that early the next morning, January nineteenth, he succeeded in that effort and very shortly the mother of the girl came to his residence and that Clara was able to and did go home with her mother that morning. She died the following afternoon, defendant not having seen her after she left his residence to go home with her mother on the morning of January nineteenth.

To sustain the charge that this young woman died from the effects of a criminal operation the People produced the testimony of two physicians, Dr. Roy A. Page and Dr. Harold A. Patterson. Neither one of these physicians had treated her.   Dr. Page testified that he did not see the young woman until she was in a dying condition and just before her death, and Dr. Patterson never saw her until after her death.   Dr. Page testified that he called to see her on the afternoon of January twentieth; that she was unconscious and dying and that he could get nothing from her as to how she felt, but a physical examination showed her condition was due to septic peritonitis.   After her death he assisted in performing an autopsy and testified that from his examination and the history of the case it was his opinion that her death was caused by a criminal operation for the relief of pregnancy.

Dr. Patterson testified that from his investigation and examination it was his opinion that this septic condition was caused by an attempted operation to terminate pregnancy.

Dr. Page did not state what examination he had made or what facts were disclosed thereby.   He did not state what history of the case he had received or from whom.   Neither physician gave any facts from which they were enabled to form an opinion as to the cause of death.   Both physicians testified that the septic condition they found could be produced by a great number of conditions aside from an operation to relieve pregnancy.   So far as any facts are disclosed by the testimony of the physicians the septic condition they found might have resulted from any of the many causes they testified might produce it.

The opinions of these experts as to the cause of the death of this young woman were improperly received, for they were not based on any facts testified to by either of them that were within their knowledge, or assumed to be true in the form of a hypothetical question.   (*Marx* v. *Ontario Beach Hotel & Amusement Co.*, 211 N. Y. 33; *Broderick* v. *Brooklyn, Queens County & S. R. R. Co.*, 186 App. Div. 546.)

In an attempt to connect the defendant with the performance of the operation to which the experts testified, the district attorney

called the mother of the young woman and she was permitted to testify, over defendant's objections and exceptions, that on the morning of January twentieth after the daughter had returned to her home she told her mother where she had been, and what had happened, and that she had been operated on and that she was " right in that [defendant's] house from the time she went in until the time she came out."

Defendant was not present when it is claimed the girl made these statements to her mother. This was hearsay evidence pure and simple, and was improperly received. As the learned and experienced justice who granted a certificate of reasonable doubt in this case stated in his opinion: " I think the evidence as to the conversation, the defendant not being present, was erroneously received and that it was highly prejudicial to the defendant."

This evidence was received on the theory that it was a dying declaration. The district attorney, by repeated questions, sought to have the witness testify that these statements were made by her daughter in anticipation of death, but the mother could not so testify, but stated among other things in response to the district attorney's questions: " No, she didn't think but what she was coming all right," and then after the court had asked the district attorney to lay the foundation for the admission of the statements, he made a further effort and asked the witness: " Did she say anything else about expecting to die? " and the witness replied: " She didn't seem to worry so much about dying." The district attorney still persisted and asked the witness these questions: . " Did she express any hope that she was going to recover? " " Was she gradually growing weaker and suffering more pain? " " Did she express to you in words or by actions that she understood that she was going to die? " He received no satisfactory answers and finally the court took hold of the situation and asked the witness: " What did she say about dying or living? " and the witness replied: " I don't think the girl really thought she was going to die at the last. I don't think so."

It is plain from this examination that no proper foundation was laid for the admission of the statements alleged to have been made by Clara Hagan to her mother in the absence of defendant on the theory that they were dying declarations.

To entitle dying declarations to be received in evidence they must be made by a person who believes he or she is about to die and has no hope of recovery.

" The evidence should be clear that the declarations were made under a sense of impending death without any hope of recovery." (*People* v. *Sarzano,* 212 N. Y. 231; *People* v. *Conklin,* 175 id. 333.)

" There must be proof that the declarant believed it, that recovery was impossible and no hope of recovery." (*Peak* v. *State*, 50 N. J. L. 179.)    To the same effect: *People* v. *Chase* (79 Hun, 296; affd., 143 N. Y. 669); *People* v. *Mikulec* (207 App. Div. 505, 507).

The foundation laid for the admission of Clara's statements to her mother as a dying declaration did not measure up to these conditions. The deceased according to the testimony of her mother not only did not believe that she was going to die but as her mother testified the girl " didn't think but what she was coming all right. * * * She didn't seem to worry so much about dying," and finally the mother testified: " I don't think the girl really thought she was going to die at the last. I don't think so."

Notwithstanding all this the damaging statements were permitted to stand, and in his summary to the jury the district attorney took full advantage of the mother's testimony when he said: " The testimony of the girl's mother is such, and is uncontradicted and the record will show it uncontradicted by the defendant, and it must be taken here, gentlemen, as the truth, that that girl was deprived of her life by reason of this criminal operation for the termination of pregnancy, and that that criminal operation was performed, by the evidence here, beyond a reasonable doubt, at the residence of Charles Flaherty, the defendant, in the village of Mount Morris  *  *  *."

It is urged by the district attorney that even though the evidence of the mother as to the alleged dying statements of her daughter was erroneously received in evidence, it would not affect the result, and should be overlooked under the authority of section 542 of the Code of Criminal Procedure, on the theory that defendant's rights had not been prejudiced.

That might be true in a case where such dying declarations added nothing to the facts presented (*People* v. *Sprague*, 217 N. Y. 373), but in a case like this where the evidence of defendant's guilt is based largely on the fact that he may have had the opportunity to commit the crime, prejudicial dying declarations tending to establish defendant's connection with the crime charged against him without laying a proper foundation for their admission in evidence, was a substantial error which cannot be overlooked.

It is urged by the district attorney that no motion was made to strike out this evidence, and that defendant should not now be heard to urge this error to defeat " a just verdict."

It is the duty of the appellate court to search the record and as far as may be see that justice is done.    This defendant, attempting to try his own case without the aid of experienced counsel, was

14

Fourth Department, November, 1926.          [Vol. 218

entitled to every reasonable consideration to the end that he receive a fair and impartial trial. If through inexperience or ignorance, or for any other cause he failed to note exceptions, or make motions to strike out improper evidence, it should not preclude him from the right to a fair hearing, and it is the duty of this court to order a new trial, if in its opinion justice requires it, whether or not exceptions were taken by defendant to erroneous rulings in the court below, or motions made to strike from the record evidence that had been improperly received. (Code Crim. Proc. § 527; *People* v. *Minkowitz,* 220 N. Y. 399; *People* v. *Console,* 194 App. Div. 824; *People* v. *Oxfeld,* 121 Misc. 524.)

Many other alleged errors are pointed out by the learned counsel for the defendant which it is urged require a reversal of this judgment. It is not necessary to discuss them, however, in view of the fact that we have concluded that because of the errors heretofore pointed out there must be a new trial.

The defendant may be guilty of the crime charged against him. If so and he is to be convicted it should be on sufficient and legal evidence and on a record reasonably free from substantial errors prejudicial to his interests.

The judgment of conviction should be reversed on the law and the facts, and a new trial ordered.

HUBBS, P. J., DAVIS, SEARS and CROUCH, JJ., concur.

Judgment of conviction reversed on the law and facts and a new trial granted.