## COURT OF APPEALS.

### October 3, 1911.

## THE PEOPLE v. PIETRO FALLETO.

(202 N. Y. 494.)

(1.) MURDER—PREMEDITATION AND DELIBERATION.

On review of the evidence upon which defendant was convicted of murder in the first degree, *held*, that the jury was justified in finding that he committed the crime not only with deliberation and premeditation, but while he was engaged in the commission of a felony, and hence that he was guilty under both counts of the indictment.

(2.) SAME—DYING DECLARATIONS.

It is well settled that while dying declarations should be received with great caution they are competent in a criminal prosecution for homicide in so far as they state facts, but not opinions, relating to the circumstances of the crime and the perpetrator thereof, provided a sufficient foundation is first laid.

(3.) SAME.

The absolute requirements preliminary to the admission of such evidence are that there must be clear proof of the certainty of speedy death, and that the declarant had no hope of recovery. Such facts, however, need not be proved by statements made to or by him, but may be inferred from the surrounding circumstances, such as the nature of his wounds, his physical condition, preparation for death and the like.

(4.) SAME.

Upon examination of the circumstances under which the deceased made the statement which was received in evidence, *held*, that from all the facts and especially from the nature, extent and effect of his wound, as well as his engaging in the last religious rites for dying men, it could properly be found that all hope of life had left him when he made the declaration in question.

APPEAL from a judgment of the Supreme Court rendered November 23, 1909, at a Trial Term for the county of Westchester, upon a verdict convicting the defendant of the crime of murder in the first degree.

The indictment contained two counts, by the first of which the defendant was charged with taking the life of Louis Levine " feloniously, willfully, maliciously and unlawfully, and with a deliberate and premeditated design to effect " his death. The second count charged the same crime, committed by the defendant while " feloniously and unlawfully engaged in the commission of a felony, to wit, the crime of grand larceny in the second degree."

The facts, so far as material, are stated in the opinion.

*William J. Fallon* and *David H. Hunt,* for appellant. The exceptions to the admission of the dying declaration of the deceased were well taken. (People v. Brecht, 120 App. Div. 769; People v. Governale, 193 N. Y. 581; People v. Del Vermo, 192 N. Y. 470; People v. Morse, 196 N. Y. 306; People v. Evans, 40 Hun, 492; People v. Chase, 79 Hun, 206, 143 N. Y. 669; People v. Kraft, 148 N. Y. 631.)

*Francis A. Winslow,* District Attorney (*Lee Parsons Davis,* of counsel), for respondent. The dying declaration was properly received in evidence. (People v. Del Vermo, 192 N. Y. 470.)

Vann, J. :

The homicide which is the subject of this appeal occurred on the 13th of August, 1909, in the back part of a second-hand clothing store kept by Louis Levine, the deceased, in the village of Port Chester, county of Westchester. Mr. Levine was a feeble old man, five feet high, eighty-nine years old, and weighing about one hundred pounds. The defendant is thirty-three years of age, five feet ten and one-half inches in height, and weighs about one hundred and eighty pounds. The fatal wound was a straight cut across the throat, just above the Adam's apple, parallel to a line drawn from shoulder to shoulder, three

and a half inches long and two inches deep, severing the wind pipe. The cut was under the beard, which was intact, although it was five or six inches long and the neck of the deceased was short. A disinterested eye-witness testified that at about three o'clock in the afternoon of Friday, August 13th, 1909, he saw the defendant holding Louis Levine down upon a lounge with his left hand and cutting his throat with a knife held in his right hand. This story was corroborated by all the circumstances established by the testimony of substantially all the witnesses except the defendant himself.

The defendant, as a witness in his own behalf, admitted that he inflicted the fatal wound but claimed that he had a quarrel with the old man who caught up a knife and assaulted him. He testified that he wrested the knife away and in the heat of passion struck at the deceased with it, intending to slash his face from the bottom of the ear to the mouth, but Levine threw his head back and the knife entered his neck. This story is in conflict with all the facts, conceded, or proved beyond dispute.

There was no claim of justification or self-defense, but simply that the defendant was not guilty of murder, although it was conceded that he might be guilty of manslaughter. The deep wound in the short neck of the deceased could not have been inflicted by an attempt to slash the face and as the long beard was not cut or disturbed it must have been held up before the knife could have been drawn straight across the throat. Moreover, the defendant was in urgent need of money and the pocketbook habitually carried by the deceased was found in the outside pocket of the defendant's coat as he was forthwith arrested within a short distance of the store while running away. He claimed that he owned the pocketbook for several months but two witnesses testified that it was the property of the deceased.

It is unnecessary to give a more detailed statement of the facts or to review the evidence, which strongly tended to show that the defendant threw a coat over the old man's head, pushed

him down upon the lounge, robbed him and then killed him in order to escape. The jury was justified in finding that he did the act not only with deliberation and premeditation but also while he was engaged in the commission of a felony, and, hence, that he was guilty under both counts of the indictment. We see no reason to disturb the verdict so far as the merits are concerned.

But one question of law requires discussion and that is whether the dying declarations of the deceased were properly received in evidence subject to the objection of the defendant. The preliminary evidence tended to show that the deceased could not speak until " his throat was sewn " at the hospital, about thirty minutes after the wound was inflicted and after the operation he could speak only in a whisper. Just before the operation the surgeon told him that he was liable to die as the result of the injury, but he does not appear to have made any reply. In the evening the surgeon asked him how he felt and he said: "I don't know what I have done in this world to deserve such an end." Some minutes later, when he showed signs of choking as the blood ran down his wind pipe into his lungs, the doctor again asked him how he felt and he replied, "I feel better, if I could only cough this up I might feel better."

On Saturday evening, about thirty hours after the injury, the surgeon asked him " if he wished to say his religious rites, if he wished to say vivi, that is the last rite of the Hebrew church," of which he was a member. " I asked him if he wanted to say vivi and I would send for Mr. Stein, the rabbi." It does not apappear that the deceased assented to this or requested that the rabbi should be sent for, but he came, and at once asked Mr. Levine, " Do you want to say vivi ? " The answer was, " Yes," and thereupon "they proceeded to say vivi. They went through the last rites of the Hebrew church. * * * The last rites for the dying." Right after this the surgeon asked him if he had anything else to say in the presence of his family who had assembled

by his bedside, and he said, "Yes, I want my family to pay the following debts," giving the names of his creditors. The surgeon further testified: "After we had stitched up the wound he was able to make himself understood by speaking in a low whisper, because his wind pipe was connected, but the blood was just the same, gradually going into his lungs and choking him by degrees, and from the lapse of blood he was actually getting weaker, and was rapidly failing, sinking. On this Saturday night, when the rabbi was there, he had been in a comatose condition before that time. * * * He was sinking very rapidly, growing worse all the time, growing worse all this while from loss of blood, and the blood going into his lungs, and his heart was growing weaker. * * * There was no hope at all of his recovery."

A daughter of the deceased testified that on Saturday evening about eight o'clock a good many persons from the synagogue, as well as several members of her own family, had gathered about his bed. She "was present when Rabbi Stein said the last rites, called vivi. * * * The last rites, they say that when they know they are going to die, they ask for it." As soon as the vivi was said the deceased told his family to pay all his debts, and the rabbi "put all the names down that he said he owed, and every one was correct."

After the last service for the dying had been performed, and the deceased had given directions for the payment of his debts, he told his friends about his bedside how he was injured. The surgeon was asked to state what he said upon that subject, when the defendant's counsel objected, " upon the ground that the conditions precedent to giving a dying declaration have not been established." The objection was overruled and an exception taken. The surgeon answered: " He then said to his children, they were all standing around the bedside, ' Did you hear what happened to me ? ' They said, ' No, what was it ? ' He told them in Yiddish that an Italian came into his store and asked

him if he had any second-hand overcoats to sell, and he said he did, and showed him one, and that the Italian put the coat on him and looked it over and then said, ' That suits me,' and took the coat off him, and in the act of doing so, the old man said, " He threw it on me and pushed me over to the sofa and threw me down and then he took some instrument and I felt myself being cut by some instrument. I can't just at present recall anything else." This declaration was made on Saturday evening shortly after eight o'clock, and the deceased lingered until Monday morning, between one and two, when he died.

Dying declarations are dangerous, because made with no fear of prosecution for perjury and without the test of cross-examination, which is the best method known to bring out the full and exact truth. The fear of punishment after death is not now regarded as so strong a, safe-guard against falsehood as it was when the rule admitting such declarations was first laid down. Such evidence is the mere statement of what was said by a person not under oath, usually made when the body is in pain, the mind agitated and the memory shaken by the certainty of impending death. A clear, full and exact statement of the facts cannot be expected under such circumstances, especially if the declaration is made in response to suggestive questions, or those calling for the answer of " Yes " or " No." Experience shows that dying declarations are not always true. As we said in People v. Corey (157 N. Y. 332, 349) : " It has happened that a dying declaration accusing the defendant made one day was contradicted by another dying declaration of the same person made on a subsequent day, stating that the defendant ' did not do it.' (Moore v. State, 12 Ala. 764, 46 Am. Dec. 276.) So dying declarations have been shown to be positively untrue. (White v. State, 30 Tex. App. 652.)" Men sometimes lie even when facing death, as has frequently been known of convicts about to be executed, and the motive of self-exoneration which induced them to lay the crime on some one else might

move a declarant to say that the accused was the aggressor by committing the first assault. Experience shows that dying persons have made self-serving declarations, such as false accusations, in order to destroy their enemies, and false excuses in order to save their friends.

It is well settled, however, that while such evidence should be received with great caution, dying declarations are competent in a criminal prosecution for homicide in so far as they state facts, but not opinions, relating to the circumstances of the crime and the perpetrator thereof, provided a sufficient foundation is first laid. This exception to the general rule excluding hearsay evidence is founded largely on what is regarded as a public necessity, and the rule yields to the exception in order to protect the innocent and punish the guilty. As the subject of the homicide cannot testify his unsworn statement of what happened to him is considered the best evidence attainable, and, hence, is admitted as legal evidence in order to prevent injustice, after all reasonable precautions have been taken to secure a truthful statement. Still the law does not regard such evidence, when admitted, as of the same value and weight as the testimony of a witness given in open court under the sanction of an oath and under the tests and safeguards which are there provided. (People v. Kraft, 148 N. Y. 631, 634.)

The absolute requirements preliminary to the admission of such evidence are that there must be clear proof of the certainty of speedy death, and that the declarant had no hope of recovery. Such facts, however, as we have recently held, need not be proved by statements made to or by him, but may be inferred from the surrounding circumstances, such as the nature of his wounds, his physical condition, preparation for death and the like." (People v. Del Vermo, 192 N. Y. 470, 488.) In the case before us the certainty of death within a very short time was proved by direct evidence, but there was no direct evidence that the deceased believed he could not recover. While in fact

death was imminent, he was not told that he could not live and
he did not declare that he had no hope of living. The circum-
stances, however, permitted the inference that he had given up
all hope. He knew, or it could properly have been found that
he knew, that he was old and frail; that his throat had been cut
so deep as to sever the wind pipe; that the blood was running
into his lungs and choking him; that he was weak from the loss
of blood and was rapidly growing weaker; that he had been un-
conscious, his heart was failing and he was sinking fast. In
addition, he had said, in answer to a question as to how he felt,
that he did not know what he had done to deserve such an end,
and had taken part in the last rites provided by his church for
the consolation of the dying. Guided by his rabbi he said the
vivi, which is repeated by those who "know they are going to
die." When the religious rite was ended he gave directions as
to his business affairs, to be carried out after his death. From
all these facts and especially from the nature, extent and effect
of his wound, as well as his engaging in the last religious rites
for dying men, it could properly be found that all hope of life
had left him when he made the declaration in question.

We think the evidence was properly received and while we
find many authorities to support this conclusion we find no well-
considered case to the contrary. (People v. Conklin, 175 N. Y.
333, 340; People v. Del Vermo, 192 N. Y. 470, 488; Carver
v. United States, 164 U. S.694, 695; State v. Swift, 57 Conn.
496, 505; Commonwealth v. Williams, 2 Ash. 69, 75; People v.
Buettner, 233 Ill. 272, 275; State v. Kelleher, 201 Mo. 614,
637; Regina v. Howell, 5 Denison Crown Cases, 1; Wharton on
Homicide, §§ 637, 640; Underhill on Criminal Evidence, §
104; 2 Wigmore on Evidence, § 1438.)

    While these cases bear on the general subject they also hold
that when the wound was necessarily fatal and its nature such
that the injured person must have realized his situation and he
asked and received religious consolation, his statement as to the

cause of his death is competent as a dying declaration. The mere fact that the deceased lingered more than twenty-four hours after making the declaration did not render it incompetent, for its competency depended on the state of his mind when he made it and the interval between the declaration and death bore mainly on the question as to the certainty of death. (Woodcock's Case, 2 Leach C. Law, 563; People v. Weaver, 108 Mich. 649; Moore v. State, 96 Tenn. 209; Daughdrill v. State, 113 Ala. 7; Commonwealth v. Cooper, 5 Allen, 495; Commonwealth v. Roberts, 108 Mass. 296.)

As we find no error in the record and the evidence against the defendant is clear and convincing the judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.