THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ANTHONY LICCIONE, Appellant.

Fourth Department, July 13, 1978

### APPEARANCES OF COUNSEL

*John R. Parrinello* for appellant.

*Lawrence T. Kurlander, District Attorney (Melvin Bressler* of counsel), for respondent.

### OPINION OF THE COURT

SIMONS, J.

Defendant has been convicted of murder, second degree, arising from the death of his wife, Mary Liccione. He was not present when she was attacked and fatally stabbed, but before she died Mrs. Liccione told witnesses that defendant had hired

her assailant to kill her. Defendant's conviction rests substantially upon her dying declarations and upon his admissions to the police and although urging several points on this appeal, the primary grounds urged for reversal concern the trial court's denial of his motions to suppress this evidence.

In the early morning of June 16, 1975, defendant left his downstairs Rochester apartment for work. Later, about 8:30 A.M., his children left home for school. Mrs. Liccione was not feeling well that morning and after the children left she locked the storm door on a rear entryway to the kitchen and the kitchen door and returned to bed. The living room furniture had been pushed against the front door by her husband the night before and the only remaining door to the apartment, other than the kitchen door, was not usable. About five minutes after she returned to bed, Mrs. Liccione heard a key turning in the kitchen doors. She went into the dining room to investigate and found a Black man standing there with a rifle. She attempted to take it away from him and during the ensuing struggle the rifle fired three times before the man dropped it. Mrs. Liccione tried to escape by breaking through a screened window but her assailant stabbed her several times as she did so. Neighbors, alerted by her screams and by the rifle shots, ran to the Liccione house and found Mrs. Liccione in the driveway below the broken window screen. When they told her that they would call her husband she protested, "No, that nigger told me he paid him, he paid", "he made the nigger do this to me", "that nigger told me my husband told him to do this to me", "help me I am going to die", "that nigger told me my husband told him to do this", "he met the guy at work, they planned it at work", "I am going to die, don't let my husband have the kids". Later that evening she repeated similar statements to her parents and the police at the hospital.

When Mrs. Liccione was examined by a doctor at the hospital, he discovered multiple stab wounds on her neck, shoulder, back and chest. She had lost a tremendous amount of blood and was in deep shock. The doctor was unable to obtain a blood pressure and in his opinion, Mrs. Liccione was dying. She remained hospitalized until she died from the stab wounds on June 24, 1975.

The police arrived at the Liccione apartment at about 8:45 A.M., shortly before decedent was removed to the hospital. Upon entering they discovered two keys on the living room

floor and a rifle in the sitting room. The keys fit the storm door and the kitchen door at the rear entrance to the apartment. The rifle held nine rounds of ammunition and when found it contained six unfired cartridges. Three spent bullet casings were recovered in the apartment. There was blood on the rifle and on the window through which Mrs. Liccione exited. The murder weapon was never found.

· Defendant was called at his job and he returned home to be met by Detectives Trotto, Gangemi and Perticone at the driveway to his apartment house. He was told then for the first time that his wife had been assaulted. When questioned, defendant stated that he owned a .22 calibre rifle which he normally kept in the garage with a box of shells but he stated that he had moved the rifle and shells to a camper parked in the driveway a few days earlier to keep them away from his children. Defendant stated that he had the only keys to the garage and camper and when asked how the children could gain access to the garage if he had the only key, he did not answer. The police asked defendant to see the rifle but defendant was unable to locate his key to the camper. Eventually the police discovered that the camper was unlocked. Defendant could not find the rifle or shells in the vehicle and when shown the rifle found in the apartment, he identified it as his and stated that he had no idea how it got from the camper to the house.

Defendant also identified the keys found in the living room as his. He stated that the keys were left on a window ledge outside the kitchen door in the shed between the storm door and the kitchen door so that his wife and children could use them to get into the house. When asked why he left the key to the storm door on a windowsill inside the shed and behind the storm door, defendant answered that he never locked the storm door. He further explained that the furniture was pushed against the front door of the apartment because he was painting the living room. Defendant was then asked to go to the Public Safety Building for further questioning and he agreed to do so. After he left, his children returned home and they were asked whether keys were ever left on the windowsill for them. They answered no. The police investigated the windowsill and testified that it appeared dusty and undisturbed as if nothing had been placed on it for a long time and that the sill was about five feet above the floor, too high for defendant's six-year-old child to reach.

The police found no evidence indicating that the purpose of the entry was theft. On the contrary, a woman's purse was plainly visible in the dining room but undisturbed.

The jury also heard evidence of long-standing marital difficulties between defendant and his wife. Mrs. Liccione's mother testified that defendant had threatened to kill her daughter earlier in June and another witness testified that after his wife's death defendant told the mother "I made a mistake. I should have killed you first". There was also evidence of the defendant's activities at work the morning of the attack from which the jury was asked to infer that he had attempted to establish an alibi for the time of the killing. And, finally, there was evidence that the Black man seen running from the premises shortly after the assault had been seen in the neighborhood before the day of the assault and that he returned to the apartment about 10 days after it.

As a result of the killing, defendant and Fred A. Watson were indicted for murder, second degree. The defendant was tried separately and convicted as charged.

# I

■ Initially, defendant challenges the sufficiency of the indictment. It charged that defendant and Fred A. Watson, in violation of sections 20.00 and 125.25 of the Penal Law, committed the crime of murder in the second degree in that "the defendants, on or about June 16, 1975 in the County of Monroe, State of New York with intent to cause the death of another person, to wit, Mary Luccione [sic] caused the death of such person by inflicting multiple stab wounds in and upon her body." It is defendant's contention that this indictment does not comply with CPL 200.50 (subd 7) requiring that the indictment assert facts supporting every element of the offense charged, i.e., it does not assert facts apprising the defendant that he was charged with accessorial conduct in soliciting, aiding or abetting Watson, the active wrongdoer, in committing the crime. The statute does not require such particularity, however, and that information may be obtained by way of bill of particulars, as it was in this case. The indictment advised defendant that he was charged with murder under sections 125.25 and 20.00 and under established rules, not changed by the new CPL, it was not necessary to charge the language or substance of section 20.00 in the indictment. It is familiar law that a person aiding and abet-

ting another in committing a crime is guilty as a principal and may be indicted as such although the proof establishes that he was an abettor *(People v Katz,* 209 NY 311, 325-326; *People v Bliven,* 112 NY 79, 92; *People v Henry,* 18 AD2d 293, 296). The indictment gave defendant knowledge of the charges sufficient to enable him to prepare his defense and to prevent a second indictment against him for the same offense and it was, therefore, legally sufficient *(People v Corbalis,* 178 NY 516, 519-520; see, also, *People v Armlin,* 6 NY2d 231, 234).

## II

Defendant moved to suppress statements made to the police (a) at his home on the morning of the murder, June 16, 1975, because he was not given the *Miranda* warnings before interrogation, (b) at the Public Safety Building later that day after the police read the *Miranda* warnings to him, and (c) statements made to police officers on various occasions after June 16. He also moved to suppress the evidence of a box of rifle shells seized without a warrant from his garage while he was at the Public Safety Building on the afternoon of June 16. The court suppressed the statements made after June 16 but held that the defendant was not in custody when he was questioned at his home on the morning of the assault and that he was properly advised of his rights and that he knowingly and voluntarily waived them before the questioning at the Public Safety Building. It refused to suppress the box of rifle shells. The issues are largely factual and we concur in the trial court's findings (see *People v Leonti,* 18 NY2d 384, 390).

Defendant returned to his home from work about 9:30 A.M. There were several marked and unmarked police cars parked in the vicinity and, by police estimates, there were about 13 policemen on the premises performing various duties. At the time that the detectives met defendant at the driveway at least two of them had been advised that Mrs. Liccione had accused her husband of complicity in the assault (although they had not attended her) but they did not advise defendant of that fact. They questioned him about the items of evidence that had been found and took him inside the house and to the garage and camper for that purpose. It was during this interrogation that the defendant admitted ownership of the rifle and keys, explained that the keys were customarily left on the windowsill, that he had moved the rifle to the camper, and that he had piled the living room furniture before the

front 'door. After about an hour, defendant was asked to go to the Public Safety Building for questioning and agreed to do so. The police officers testified that defendant was free to leave at any time and that they did not seriously suspect him until his children contradicted his story about the house keys after he had gone to the Public Safety Building. Defendant testified that he believed he was in custody from the time he arrived at 755 Jay Street and that he thought he had no choice but to go to the Public Safety Building when requested to do so because he was under arrest.

█ Under the rule in *Miranda v Arizona* (384 US 436), a person may not be interrogated when taken into custody or otherwise deprived of his freedom without first being advised of his constitutional rights. Defendant alleges that his statements at 755 Jay Street on the morning of June 16 must be suppressed because he was not advised of his *Miranda* rights before he was questioned. It is his belief that the police knowledge of his wife's accusations, the number of police at the scene and the fact that he was continuously in the presence of at least two officers before being taken to the Public Safety Building were inherently coercive and demonstrate that he was in police custody at the time.

█ █ The test is set forth in *People v Yukl* (25 NY2d 585, 589): "In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what defendant thought, but what a reasonable man, innocent of any crime, would have thought had he been in defendant's position." Judged by that standard, the police were not required to warn defendant before questioning him at his home. The police did not pick up defendant. They called his employer and asked that he be allowed to come home. Defendant returned to Jay Street of his own volition. The number of officers at the scene of the crime, engaged as they were in photographing, questioning witnesses, and searching for evidence was not inherently coercive. Manifestly, a serious crime had been committed and the police were investigating it thoroughly. Most of the officers present were not concerned with defendant but were securing the scene and developing evidence. There was no battery of police officers questioning him and the detectives who did question him asked primarily about details of the crime relating to the scene itself and the physical evidence discovered there, not his connection with

the crime. From all that appears in the record, the investigating officers' methods were restrained and expeditious, without tricks or delays, and they did not forbid defendant to leave. Absent a formal arrest or actual restriction of movement, police questioning does not become custodial within the meaning of *Miranda* simply because the questioning may occur in a police atmosphere and may involve a person whom the police have reason to suspect *(Oregon v Mathiason,* 429 US 492, 495). Under all the circumstances, an innocent man in defendant's position likely would not believe himself in custody but assume he was assisting in the investigation of his wife's murder. Apparently, defendant so believed, for he never protested the questioning or asked to leave.

■ The court also found defendant was not arrested when taken to the Public Safety Building but regardless of whether he was in custody at that time, defendant concedes that his interrogation there was preceded by *Miranda* warnings. He contends only that he asked for a lawyer immediately after being advised of his rights. The court, however, found that the defendant's first request for a lawyer came much later in the afternoon, about 4:00 P.M., and that when he made that request he was permitted to telephone a lawyer and to leave for the lawyer's office promptly. Whether he voluntarily waived his rights was a question of fact and the trial court's decision denying suppression is amply supported by the evidence in the record. Notably, the information obtained from defendant at the Public Safety Building was largely repetitious of that developed in the morning by the interrogation at 755 Jay Street.

■ Finally, defendant alleges that the box of .22 calibre shells removed from defendant's garage while he was at the Public Safety Building should have been suppressed because seized without a warrant. The box held 50 shells and 9 of the 50 were missing (the rifle held 9 shells). The box was not introduced into evidence, but the police testified to the evidence, and if it was improperly seized, the testimony should have been suppressed *(People v O'Neill,* 11 NY2d 148, 154). The court found as a fact that while being questioned at the Public Safety Building defendant voluntarily consented to the police search of his garage and gave them the key to unlock it (see, generally, *People v Gonzalez,* 39 NY2d 122). The record supports that finding.

## III

Defendant contends that the various statements of Mary Liccione after the assault were not admissible in evidence because they did not meet the legal standards for dying declarations and even if they did, they were incompetent conclusions of the victim and hearsay statements of her assailant not binding on defendant.

Dying declarations are admissible in homicide cases as an exception to the conventional hearsay rule because they are believed reliable and because they are necessary. The rationale for the exception is that the fear of impending death is at least as conducive to producing the truth by a declarant as is an oath to tell the truth. Therefore, as a matter of necessity, the evidence is received after the victim dies to prevent the escape of guilty defendants or the conviction of innocent ones (see *People v Bartelini,* 285 NY 433, 439-440). The exception is firmly established in the law but historically such evidence has been received with some reluctance and great care (see, e.g., *People v Becker,* 215 NY 126, 146-147; but cf. *People v Arnold,* 34 NY2d 548). Thus, before the jury hears a dying declaration, its admissibility must be determined by the court. There seems to be no requirement that a pretrial hearing be held as was done here (see *People v Marks,* 6 NY2d 67, 75-76; *People v Coniglio,* 79 Misc 2d 808; and cf. *People v Smith,* 104 NY 491), but a foundation for reception of the evidence must be established before the jury hears the declaration and decides the weight to be attributed to it. In cases involving dying declaration evidence, the defendant is entitled to have the jury instructed, as it was in this case, that dying declarations are not to be regarded by the jurors as having the same value and weight as sworn testimony given in open court, the accuracy of which the defendant may challenge by cross-examination *(People v Mleczko,* 298 NY 153, 161; *People v Bartelini, supra,* p 442).

## A

Before ruling that a declaration is admissible, the court must determine that the statement was made by the declarant when she was *in extremis;* when she was under a sense of impending death without any hope of recovery; and that the evidence is such that the declarant, if living, would be a

competent witness to testify to it (see, generally, Richardson, Evidence [10th ed], § 307). The doctor who examined Mrs. Liccione at the hospital described her prognosis as very poor and stated that in his opinion she was dying. Manifestly, she was *in extremis* and the first challenge to the dying declarations centers on whether Mary Liccione believed at the time she made the statements, as evidenced by them and all the surrounding circumstances, that she was about to die and that she had no hope of recovery *(People v Allen,* 300 NY 222; *People v Ludkowitz,* 266 NY 233; *People v Falletto,* 202 NY 494). We are concerned with her statements made on two separate occasions; those made to the neighbors attending her in the driveway after she escaped her assailant by jumping through the window and those made to the police and to her parents in the intensive care unit of the hospital the evening of June 16 after surgery had been performed on her.

The statements in the driveway, recited earlier in this opinion, were made under a sense of impending death and at a time when Mrs. Liccione had no hope of recovery. That is established by evidence that she repeatedly told the neighbors attending her that she was dying and that she expressed concern to them for her children's future (see *People v Del Vermo,* 192 NY 470, 487-488; *People v Stacy,* 119 App Div 743, 746). It is also established by the objective evidence of her awareness of the hopelessness of her condition: she had just escaped her assailant by breaking through a window screen; she was losing blood rapidly from multiple stab wounds; and she erroneously believed herself to be shot (see *People v Falletto, supra,* pp 500-501).

Defendant points out that the courts frequently have emphasized the fact that the victim has been told she was dying to establish a certain knowledge of death (see *People v Allen, supra,* pp 226-227; *People v Falletto, supra,* p 500). That consideration is not present in this case for the simple reason that there were no medically trained people attending the victim in the driveway. Furthermore, Mrs. Liccione's requests for help, although they might be considered evidence of hope, were coupled with statements that she was going to die. They were equivocal at best and do not compel a finding that hope for life remained (cf. *People v Mikulec,* 207 App Div 505, 508, affd 240 NY 573). The circumstances under which the victim's statements were made justify the court's finding that the statements met the test of dying declarations and that Mary

Liccione had given up all hope of living at the time she made them.

The statements made by Mrs. Liccione to the police and to her parents at the hospital the night of June 16 are perhaps more open to question because of the lapse of time (although there is no evidence that the victim was aware of the time) and because her condition had stabilized somewhat after surgery. Nevertheless, the statements were made after she had received the last rites of her church, acknowledged her five stab wounds, had undergone a major surgical operation and shortly was to have another operation to remove a kidney, and at a time when she repeatedly stated that she was dying. The court properly found these statements to be generally admissible as dying declarations also.

When Detectives Trotto and Gangemi spoke to her at the hospital the night of June 16 she told them a Black man entered her apartment by the kitchen door. He was carrying a rifle which she grabbed, and the rifle fired. The struggle continued in the dining room and the sitting room and the rifle fired two more times. She told the detectives that she tried to escape through the window and while she was doing so the man stabbed her. She said she had locked the kitchen door and the storm door after the children left for school and had been in bed not more than five minutes when she heard a key in the door. She got up to see who was coming in and she saw the Black man with a rifle. She was positive that she had locked both the kitchen door and the storm door. She repeated several times to the police officers, in Italian and English, that her husband had put the man up to it. She said that she and her husband were having "family problems" and speaking in Italian she said, "mio mazzoto", which Detective Gangemi interpreted as "he or they killed me" and "sonio morta", which he interpreted as meaning "she was dead, that there was no way out".

Mario and Assunta Irenze, decedent's parents, visited their daughter at the hospital on June 16 at about 9:30 P.M. As they entered Mary's room, Mario testified that she said, "You see, Dad? See what happened? I'm going to die because of these five stabbings", and then referring to defendant added, "You see what that disgraceful man did to me".

Assunta testified that when she and Mario first visited her daughter she said, "Mom, I'm going to die * * * my husband has had me killed", and "I've been stabbed five times and I'm

going to die". Assunta and Mario then left the room while Detectives Trotto and Gangemi spoke to her for about 20 minutes. After the detectives concluded the conversations described above, Assunta and Mario re-entered Mary's room and testified that they asked her: " 'Why didn't you run through the front window or something?' She said, 'I fought with the person to take away the gun. I screamed. I screamed for help.' Then this gun fell to the ground and then this man said 'I have to kill you.' My daughter said—she said, 'Why?' This man responded, 'I must kill you.' ' "

Thus, there were three sets of statements similar in content and made to three separate groups of auditors. Significantly, the first persons to hear the accusations did not solicit the information and they were neighbors, not investigating police. On all three occasions the victim was mortally wounded and repeatedly expressed her belief that she was dying. The surrounding circumstances support her belief and establish that she had no hope of recovery when she made the declarations.

## B

■ Defendant next attacks the content of the dying declarations. He asserts that many of the statements were opinion and that dying declarations are admissible only to the extent that they state facts and not opinions or conclusions (see *People v Shaw,* 63 NY 36, 40; *People v Haber,* 221 App Div 150, 153). In the main, decedent's declarations stated what happened to her and what her assailant told her. As such, they were neither incompetent conclusions nor opinions but factual statements of what she saw and heard. Justice CARDOZO, in discussing conclusory dying declarations, explained: " 'He murdered me; [by putting poison in the whiskey bottle] does not cease to be competent as a dying declaration because in the statement of the act there is also an appraisal of the crime [citations omitted]. One does not hold the dying to the observance of all the niceties of speech to which conformity is exacted from a witness on the stand. What is decisive is something deeper and more fundamental than any difference of form. The declaration is kept out if the setting of the occasion satisfies the judge, or in reason ought to satisfy him, that the speaker is giving expression to suspicion or conjecture, and not to known facts." *(Shepard v United States,* 290 US 96, 101; see, also, Richardson, Evidence [10th ed], § 312.) Doubtless some of Mrs. Liccione's statements were incompe-

tent speculation, but those in which she related the events of the morning and said that her husband had procured her assailant to kill her, based as they were upon what the assailant told her, were not and on the whole record we do not find the receipt of the incompetent evidence ground for reversal *(People v Crimmins,* 36 NY2d 230).

## C

Finally, defendant contends that he is not bound by statements of the assailant which inculpated him. If Watson's statements were statements of a coconspirator made during the course of a conspiracy and in furtherance of its purpose, however, they were admissible against defendant *(People v Rastelli,* 37 NY2d 240; *People v Luciano,* 277 NY 348, 358; *People v McKane,* 143 NY 455).

The basis for the rule permitting vicarious statements is the joint enterprise relationship between the parties and the assurance of truthfulness derived from the fact that the statement is against the declarant's penal interest. Thus before the assailant's statements may be submitted to the jury, the People are required to establish the joint enterprise by submitting prima facie evidence of a conspiracy between him and defendant (see *People v Luciano, supra,* p 358; *People v Connolly,* 253 NY 330, 336-342; Necessity and Sufficiency of Independent Evidence of Conspiracy to Allow Admission of Extrajudicial Statements of Coconspirators, 46 ALR3d 1148, Ann.) and that evidence must be supplied without relying on the statements of the alleged coconspirator (see Richardson, Evidence [10th ed], § 244). Circumstantial evidence of the conspiracy existed in this case upon proof that: an intruder seen running from the house stabbed Mrs. Liccione; he gained entry into the apartment by using defendant's keys; defendant offered an explanation which was later contradicted that he left his keys on the windowsill for the children; the intruder used defendant's rifle which had been left loaded in defendant's unlocked camper; the intruder was seen in the neighborhood before and after the assault; the night before the incident the defendant had moved the furniture to block the only exit from the apartment other than the kitchen door; defendant and his wife were having marital difficulties; defendant had threatened to kill his wife before the assault; defendant made statements after the assault indicating that he was responsible for his wife's death, that he knew her killer and intended to kill him; and defendant attempted to develop an

alibi at work at the time of the killing. On the basis of this proof, the jury could find that a conspiracy existed between the two men and assuredly any statements made by the assailant during the assault were made in the course of that conspiracy.

Although defendant has not raised it, one further issue remains and it is that issue alone which divides the court. The dissenters contend that the assailant's statements were not made "in furtherance of the conspiracy" inasmuch as the statements did not advance the conspiracy's purpose. Few New York cases appear to have considered the precise question of what is meant by the phrase "in furtherance of the conspiracy". Coconspirators' statements have been excluded most frequently because they were not made in the course of the conspiracy (see, e.g., *Garnsey v Rhodes,* 138 NY 461, 465; *People v Davis,* 56 NY 95).

Under the rule applicable in Federal courts, Watson's statements were clearly admissible. In *Wiborg v United States* (163 US 632), defendants, the captain and crew members of the ship *Horsa,* were charged with violating the United States Neutrality Acts by transporting men and arms to Cuba during its war with Spain. Defendants contended that they had not "provide[d] or prepare[d] the means for, any military expedition or enterprise" because they had merely transported men and supplies to the war zones. The court agreed that the mere transportation of men with arms to enlist in a foreign army was not an offense. It held, however, that if the ship's passengers earlier had been organized into a military group in this country to go to Cuba and war on the government, the party would constitute a military expedition and transporting it would violate the neutrality statutes. The question of defendants' knowledge of the expedition thus became critical to conviction. To establish that knowledge the government introduced testimony that members of the military expedition had made statements concerning their plans and purpose in going to Cuba during the voyage and the trial court received the statements as declarations of coconspirators binding on defendants. The trial court charged that "what was said by any of them *at the time of carrying out their purpose* was evidence against them all as to the nature of the expedition" (p 643; emphasis added). The Supreme Court approved the instruction and recited the rule that the statement for a conspirator is admissible against his coconspirator if "made in furtherance

of the common object, *or * * * [if it is]* part of the *res gestae* of acts done in such furtherance. Assuming a secret combination between the party and the captain or officers of Horsa had been proven, then, on the question whether such combination was lawful or not, the motive and intention, declarations of those engaged in it explanatory of acts done in furtherance of its object came within the general rule and were competent [citations omitted]" *(Wilborg v United States, supra,* pp 657-658; emphasis added; see, also, *United States v Annunziato,* 293 F2d 373, 380; *International Ind. Co. v Lehman,* 28 F2d 1; *United States v du Pont de Nemours & Co.,* 107 F Supp 324, 325). The coconspirators' statements in *Wilborg* manifestly did not "advance" the conspiracy but they were part of the *res gestae* of acts done in furtherance of the conspiracy and thus admissible.

■ The Federal rule has been accepted in several State jurisdictions and by text writers generally (McCormack, Evidence [2d ed], § 267, p 645; 31A CJS, Evidence, § 362, subd b; 42 Harv L Rev 464-466; and see Model Code of Evidence, rule 508, subd [b], which requires only that the statement of the conspirator be relevant to a conspiracy to bind his absent coconspirator). Indeed the New York Court of Appeals has written similarly that statements of a conspirator "made in the furtherance of the [conspiracy] * * * *or* constitut[ing] a part of the *res gestae* of some act done for that purpose" are admissible against his absent coconspirator *(People v Davis,* 56 NY 95, 103, *supra;* see, also, *People v Rastelli,* 37 NY2d 240, *supra).* Thus, in *Rastelli* one of the coconspirators in a loan sharking operation, when arranging for future loans, told the victim that the interest of 4% per week would be split, with 2% going to the defendant "because it's his money". This statement was used to identify the defendant as the financier of the operation. The Court of Appeals held, without specifically discussing the issue, that the statement was made during the course and in furtherance of the conspiracy. It is apparent from the facts recited by the court, however, that the statement that the loan money belonged to defendant Rastelli did not by itself further the conspiracy because knowing the source of the money would not induce the victim to accept the usurious loan. Rather, the statement was made to explain the actions of the declarant. It was permitted as evidence against a coconspirator because it was part of the *res gestae.* Here, the statements by the assailant that defendant had paid him to

kill Mary Liccione were made contemporaneously with the assailant's act of trying to kill her. The act was in furtherance of the conspiracy, the words in explanation of the act were part of the *res gestae,* and the assailant's statements were admissible against defendant as declarations of a coconspirator *(Wilborg v United States,* 163 US 632, *supra; People v Rastelli supra;* and, see, also, *People v Davis, supra).*

We have considered the other points raised by defendant and do not find them to be grounds for reversal.

The judgment should be affirmed.

MARSH, P. J. (dissenting). We agree with the majority of the court that the requirements of proof preliminary to the admission as dying declarations of certain statements made by the victim of the alleged homicide, Mary Liccione, subsequent to the fatal assault upon her were properly established by evidence that she was at the time of making such statements *in extremis* and under a sense of impending death, without any hope of recovery. However, no wider latitude can be given dying declarations in applying the rules of evidence as to competency than properly would be given testimony of a sworn witness. Several witnesses including neighbors, police officers and relatives of the victim testified to statements of the alleged assailant, Watson, made to the victim at the time of the assault. She related to them, "that nigger [the alleged assailant] told me he [her husband] paid him, he paid"; "he told me my husband told him to do this"; "he met the guy at work, they planned it at work". It was also testified that she stated, "he made that nigger do this to me"; "my husband had me killed"; and referring to defendant, "see what that disgraceful man did to me". The statements of the alleged assailant made to the victim and received as dying declarations of the victim directly implicating the husband defendant as a coconspirator are incompetent as against him and would be so if the victim had testified to them under oath. They could not be deemed made to advance the purpose of or in furtherance of the common plan of the conspirators and the object of the conspiracy and were merely narrative declarations of past dealings between the assailant and the defendant. Also from the record it does not appear that the victim had any source of knowledge as to her husband's participation in the murderous assault except the disclosures of the coconspirator and therefore her expressed opinions and conclusions as to his connection with the crime were likewise incompetent

as expressions of mere suspicions or surmise *(People v Shaw,* 63 NY 36, 40).

In order to render the acts and declarations of one conspirator admissible against another it has been held uniformly in this State that such acts and declarations must occur while the conspiracy is in progress and must be in furtherance of its purpose or object and the common plan of those engaged in the joint criminal enterprise *(People v Rastelli,* 37 NY2d 240, 244; *People v Fiore,* 12 NY2d 188; *People v Luciano,* 277 NY 348, 358; *People v Connolly,* 253 NY 330, 340; *People v Becker,* 215 NY 126, 148; *People v McKane,* 143 NY 455, 470; *Garnsey v Rhodes,* 138 NY 461, 465). The object and purpose of the conspiracy was to have the conspirator, Watson, kill the victim and any act or declaration of his having for its purpose that objective and the achievement of that scheme was within the scope of the execution of the conspiracy and chargeable to both conspirators. Each party to the joint criminal enterprise was for the purpose of attaining the common objective the agent of the other.

The narration by the assailant, Watson, to the victim of the circumstances under which he met defendant, when the assault had been planned, where it had been planned, and the arrangements entered into between the defendant and him, while made during the course of the assault clearly was not made in pursuance of the original concerted plan and for the promotion of the common objective. Rather, the declarations constituted a gratuitous relation of events occurring some time in the past and were improperly received as an unsworn statement offered to prove the truth of the very damaging matter presented in it. As statements of past occurrences not any part of the events occurring at the time of the assault, they could not be deemed part of the *res gestae* (see *People v Davis,* 56 NY 95, 102, 103).

*People v Rastelli* (37 NY2d 240, *supra)* cited in the majority opinion to support the competency of the statements directly implicating the defendant as a coconspirator is readily distinguishable from the factual situation presented here. In pursuance of a conspiracy to collect usurious interest on a personal loan one *conspirator* while discussing a plan for repayment involving the victim's aid in securing other loan victims, related the proposed split of interest payments among the conspirators. The explanation included a reference to the defendant Rastelli as the one receiving the highest interest

payment " 'because it's his money' ". The plan presented to the victim in *Rastelli* for repayment contemplated his participation in the loan sharking conspiracy and in securing his acceptance of the plan, the split of interest payments including the payment to Rastelli was outlined to him. The statements made during the negotiations with the victim were made to induce his participation and clearly were in furtherance of the objectives of the illegal conspiracy. Such a factual situation is not presented here.

In view of the highly emotional and prejudicial character of the testimony relating to the dying declarations of the victim and its likely impact on the jury, there is no reasonable basis for a finding that there is no significant probability that the jury would have acquitted the defendant if the dying declarations were not admitted.

The judgment of conviction should be reversed and a new trial granted.

MOULE and WITMER, JJ., concur with SIMONS, J.; MARSH, P. J., and DILLON, J., dissent and vote to reverse the judgment and grant a new trial in an opinion by MARSH, P. J.

Judgment affirmed.