THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DALE ALLEN BROWN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD BRUCE REED, Appellant.

Fourth Department, January 19, 1979

**APPEARANCES OF COUNSEL**

*Ronald C. Valentine* for appellants.

*Stephen R. Sirkin,* District Attorney, for respondent.

## OPINION OF THE COURT

SIMONS, J.

Defendants Dale Brown and Richard Reed pleaded guilty to murder second degree in satisfaction of six-count indictments which also charged each with additional counts of murder, robbery, burglary and larceny. They contend on this appeal that the trial court erred in denying motions to suppress their confessions.

The charges arise out of the October 19, 1975 killing of Thelma Silvernail, a 70-year-old resident of Sodus Center, New York. Her body was discovered in her home at the foot of the cellar stairs. She had been beaten and her neck was slashed by a knife. A neighbor had seen the 19-year-old defendants in the vicinity of the Silvernail house the day of the crime and the police immediately made efforts to locate them. Among those contacted was Peter Stirpe, a former police officer who was employed as an investigator by the Wayne County Public Defender. The Public Defender had recently represented defendant Brown on a petit larceny charge and his file contained the names and addresses of friends and relatives who might be helpful in finding him. Stirpe tried unsuccessfully to locate Brown for about four hours on October 20. Two days later, on October 22, he returned to the Wayne County Jail to discuss the case with Sheriff Kise and State Police Investigator De Clerq and to search further. While he was there, De Clerq called the State Police substation at Canandaigua and discovered that both defendants had been picked up in Dansville, New York and were being returned to Canandaigua for questioning.

Stirpe called the Public Defender and advised him that Brown had been arrested. The two men had discussed the case before and the Public Defender was concerned because Brown was mildly retarded and might be vulnerable to intensive questioning. Accordingly, he directed Stirpe to go to Canandaigua immediately and interview Brown. Instead, Stirpe called the substation at about 2:30 P.M. and spoke to the Wayne County District Attorney. Although the police had been looking for the defendants for three days, had arrested them before 11:20 that morning, and had returned them to Canandaigua at about 12:15 P.M. where they had been undergoing interrogation for approximately two hours, the District Attorney denied any knowledge of Brown and denied that an arrest had been made for the Silvernail homicide.

At the time of Stirpe's call, defendant Reed had made several inculpatory admissions and a typewritten statement was being prepared for his signature. Brown had made admissions which placed him at the scene of the crime but which did not fully implicate him. He had insisted that he was innocent and he had offered to take a polygraph test to prove it. At about 3:00 P.M., while Brown was being questioned, he stated that he wanted a lawyer but he was persuaded by the police to take the test first, rather than delay to contact a lawyer. At the conclusion of the polygraph, about 5:00 P.M., he was told that the graphs showed that he was deceiving the police. In a fit of temper Brown grabbed the graphs from the machine and stated that he wanted his lawyer to examine them. The police asked whether he had a lawyer or wanted one and he answered no. The questioning continued and by 6:16 P.M. a typewritten statement had been prepared and signed by Brown in which he confessed that he and Reed knocked the victim down the cellar stairs, stabbed her with a kitchen knife, and then took $16 from her purse and escaped to Rochester in her car.

■ A competency hearing was held and the court found that although both defendants suffered from mild retardation (their IQ's were approximately 75), and defendant Reed was found to have serious psychiatric problems, both were competent to stand trial. Defendants then moved to suppress the confessions and the motions were denied. The trial court found as a fact that both defendants understood the *Miranda* warnings, had the capacity to make knowing, intelligent and voluntary waivers of their rights and did in fact do so. We have said that the effectiveness of a waiver depends upon all the facts and circumstances of the case, and mild or moderate mental retardation is not, by itself, invalidating (see *People v Tigner*, 48 AD2d 762). The trial court resolved this factual issue against the defendants and its finding is supported by the evidence in the record (see *People v Leonti*, 18 NY2d 384, 390; *People v Liccione*, 63 AD2d 305, 313).

■ Nevertheless, defendant Brown's motion to suppress must be granted, not because of his incapacity or because a lawyer was not present at the time he waived, but because he was denied his constitutional right to effective legal assistance by the conduct of the District Attorney in concealing Brown's whereabouts from Stirpe (see *People v Bevilacqua*, 45 NY2d 508; *People v Pinzon*, 44 NY2d 458; *People v Townsend*, 33

NY2d 37). Brown had not requested or retained counsel (although the Public Defender had represented him in the past), and he was, therefore, fully capable of waiving his right to counsel without an attorney present (cf. *People v Hobson,* 39 NY2d 479; *People v Hetherington,* 27 NY2d 242). But he could not obtain help from those legitimately concerned with his welfare and seeking to assist him while he was in custody if public officials concealed his whereabouts. It is the deception used to isolate Brown from help which requires suppression of all statements made by him after Stirpe's 2:30 P.M. call. Since there was no request by or for Brown for legal assistance before that call, the prior statements may be received in evidence (see *People v Pinzon, supra,* pp 464-465; and cf. *People v Bevilacqua, supra,* p 514).

Stirpe testified that when he contacted the District Attorney by telephone at the Canandaigua substation, the following occurred:

EXAMINATION BY MR. VALENTINE:

"Q. Would you relate to the Court the contents of that conversation?

"A. I asked Mr. Sirkin [the District Attorney], I said that Mr. Valentine [the Public Defender] ordered me to talk to Dale Brown and he says 'Who is he'?

"Q. Did you inform Mr. Sirkin pursuant to my instructions that we considered ourselves as representing Mr. Brown?

"A. I think something transpired. The exact terminology I couldn't tell you. We do a lot of kidding back and forth on various cases.

"Q. You did tell him however that you had been ordered to interview Mr. Brown?

"A. Yes.

"Q. He said 'Who is he'? Was there further conversation?

"A. Yes, I said 'You know who he is—you have him under arrest.' He said 'We have no one under arrest at this time.'

"Q. What time was this phone call?

"A. At 2:30.

"Q. Did you press any further relative to being able to talk to Mr. Brown.

"A. Yes, I told him I realized the situation. I told him it would be quite a while before I can get there and he just says

'I don't know what you're talking about—bye' and he hung up.

"Q. What did you do at that point?

"A. I called you. I informed you that he was not under arrest and that I couldn't talk to him."

The District Attorney did not testify or contradict Stirpe's version of the events. During his cross-examination he implied that at the time of Stirpe's call he had just arrived at police headquarters and was not fully aware of what had occurred. The police had been searching for these defendants for three days, however, to charge them with a heinous crime committed in this rural community. The District Attorney, from Wayne County, had driven to Canandaigua in neighboring Ontario County and if he did not drive there with the knowledge that Brown and Reed had been apprehended, he certainly could have discovered the facts quickly enough. Indeed, once he received the call on behalf of the Public Defender, it was his duty to find out whether Brown was there (see *People v Pinzon,* 44 NY2d 458, 463-464, *supra).*

The District Attorney also contended, as if it changed anything, that Stirpe acquiesced in his concealment of Brown.

CROSS-EXAMINATION BY MR. SIRKIN:

"Q. Mr. Stirpe, you have known the Wayne County District Attorney for some years?

"A. True.

"Q. When I said to you 'Who is he', is it true that you knew I was kidding?

"A. Yes.

"Q. There is no question in your mind?

"A. Yes.

"Q. When I said 'Who is he', you knew I was kidding with you?

"A. Yes."

The District Attorney is a public officer charged with the responsibility to seek justice, not merely to convict (Code of Professional Responsibility, EC7-13; and see *People v Savvides,* 1 NY2d 554, 556-557). That responsibility was imposed upon him throughout his official duties as a prosecutor and it could not be changed by Stirpe's acquiescence in his subterfuge. Whether he acted alone or with the tacit agreement of Stirpe, he grossly violated his public responsibilities by lying to the Public Defender's office when it made a legitimate offer of help to an accused. The fact that Stirpe may have gone along

with the charade does not make the prosecutor's conduct any less improper. It only implicates Stirpe who was also a public employee working within the judicial system and who also must be held to standards of honesty and fairness in his employment. The simple fact is that a defendant, in this case a young and vulnerable defendant suspected of a serious crime, was deprived of the effective legal assistance to which he was constitutionally entitled by the improper conduct of public officials. That may not be permitted.

We attribute no significance to the fact that the inquiry was made by the Public Defender's investigator rather than the Public Defender himself. The District Attorney knew who Stirpe was and what he wanted. Stirpe's office and purpose being known, his appearance for the Public Defender should have been recognized by the District Attorney.

In view of our disposition, we do not pass upon defendant's contention that the police improperly continued to interrogate Brown after he had requested counsel later in the afternoon on October 22.

Finally, defendant Reed contends that codefendant Brown's confession implicated him in the murder and if it is suppressed, the judgment against him must also be reversed. He relies upon *People v Donovan* (13 NY2d 148), *People v Rodriquez* (11 NY2d 279) and similar cases. The point is without merit. Those cases involved judgments after trial in which the unlawfully obtained confession was considered by the jury. This judgment was entered upon a plea of guilty and Brown's confession did not contribute to the finding of guilt. Furthermore, Reed confessed almost three hours before Brown did and his confession was not the product of any official impropriety during the interrogation of Brown.

The judgment of defendant Reed should be affirmed.

The judgment of defendant Brown should be reversed, on the law, and the motion to suppress granted in accordance with this opinion.

CARDAMONE, J. P., DILLON, HANCOCK, JR., and WITMER, JJ., concur.

Judgment [Brown] unanimously reversed, on the law, motion to suppress granted, and matter remitted to Wayne County Court for further proceedings upon the indictment.

Judgment [Reed] unanimously affirmed.