◼ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WAYNE OATES, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Kooper, J.), rendered March 16, 1982, convicting him of murder in the second degree (two counts), upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of the defendant's motion to suppress statements and physical evidence.

Judgment affirmed.

At about 3:30 P.M. to 3:45 P.M. on the afternoon of March 18, 1981, Detective Robert Meyers responded to a building on Lafayette Avenue in Brooklyn to investigate the death by stabbing during an apparent robbery of Jennifer Anderson, who had been found lying on the floor in a tenth floor apartment therein. Upon exiting the apartment several minutes later, Detective Meyers overheard a conversation between two young ladies, tenants of the building, in the hallway, during which they said that their brother, the defendant, was "cut" and had been taken to Brooklyn Jewish Hospital by their mother. The detective repaired to the hospital emergency room, where he found defendant, Wayne

Oates, then 14 years old, being treated for a cut on his hand. The treatment was nearly completed and a physician was bandaging defendant's hand.

Addressing defendant's mother, after identifying himself, Detective Meyers informed her that he was investigating the death of a tenant in her building and asked if he might speak to her son. Defendant's mother assented and Meyers read the *Miranda* (*Miranda v Arizona*, 384 US 436) warnings to defendant and his mother. Both parties indicated their understanding and both indicated that defendant was willing to make a statement without the presence of an attorney.

The detective then inquired as to the origin of defendant's injury. Defendant explained that as he was coming from school, three individuals attempted to "rip him off" at DeKalb and Kent Avenues. When Meyers indicated that he was investigating the death of Mrs. Anderson, defendant responded "Oh, she's dead?" Meyers asked that defendant and his mother show him the exact site of the incident with the individuals. They looked, but found no blood on the ground. Noticing that defendant's trousers looked fresh, the detective remarked on the absence of blood on the garment and defendant responded that he had changed clothes before going to the hospital. Meyers asked if he might have the pants defendant was wearing at the time he was accosted and both defendant and his mother agreed. The three proceeded to defendant's apartment which was across the street from the site of the alleged attempted robbery and one floor below that of Mrs. Anderson. Upon arrival, Meyers stood by the apartment door while defendant and his mother retrieved the clothes that he had changed from and brought them to the detective.

Meyers then requested that defendant and his mother accompany him to the 88th Precinct, which is adjacent to the housing development where defendant resided. They agreed, and the three drove to the precinct. Defendant was not handcuffed and was free to leave. At the precinct the three adjourned to the office of the sergeant of detectives, where, shortly after 6:00 P.M., they were joined by Detective Lehman. Detective Meyers again advised defendant of his *Miranda* rights and again defendant and his mother indicated their comprehension of the warnings and indicated defendant's agreement to talk without the presence of counsel; Meyers then inquired about Mrs. Anderson. Defendant thereafter abandoned his mugging story and gave three different statements, each more inculpatory than the previous one. In the second statement, defendant narrated that he was accosted in the lobby of his building by two youths, who

threatened him with a knife, forced him upstairs and ordered him to find them an easy apartment to gain entry into and rob. Since he knew Mrs. Anderson, defendant suggested her residence; he gained entry on a ruse and the two youths then barged in. One announced a "stick-up", the shorter youth, "Ace", manhandled Mrs. Anderson, and defendant was forced into the kitchen. He was frightened and did not observe what was happening to Mrs. Anderson. The taller youth grabbed a knife from the utility drawer, returned to where Mrs. Anderson was, and tussled with her. In an attempt to aid her, defendant grabbed the knife. He also attempted to call 911, using the wall telephone. However, he was punched by one of the youths, thereby sustaining a lacerated hand. According to Detective Lehman's notes, the defendant recounted that the larger youth had stabbed Mrs. Anderson. The youths fled, and, after a few minutes, defendant walked down to his apartment. The defendant told that officer that he had frequently been in Mrs. Anderson's apartment, she treated him like a mother, he was her son's friend, and her husband had given him a weekly allowance. At no time during the questioning was defendant in any way restrained, his responses were coherent, and at one point a family member brought him food, which he consumed.

At about 8:30 or 8:35 P.M., a time when defendant had concluded his statements to the police, Detective Lehman notified the District Attorney's office requesting that an Assistant District Attorney respond to the scene. Thereafter, Assistant District Attorney Carlos Martir arrived, advised defendant of his *Miranda* warnings, which were waived, and videotaped defendant's statement in the presence of his father, the account being substantially similar to the last account given that day to the police. Defendant was then arrested.

Before trial, defendant moved to suppress his statements and physical evidence, namely, his pants. At the hearing on the motion, the People conceded the absence of probable cause to arrest defendant until he gave inconsistent statements at the precinct; however, it was asserted that defendant voluntarily consented to assist the police in their inquiries and that his statements and the proffering of his trousers were noncustodial and voluntary in nature. Crediting the testimony of the People's witnesses, Criminal Term denied defendant's motion in all respects, concluding beyond a reasonable doubt that defendant was neither in custody at the hospital, nor at DeKalb and Kent Avenues nor during the period when he was questioned by the police at the precinct. The court further found that when defendant made statements to the Assistant District Attorney, he was

properly in custody, in view of the fact that his prior statements to the police had furnished probable cause to arrest him for the murder of Mrs. Anderson, and he had freely waived his *Miranda* rights before making the videotaped statement. Additionally, Criminal Term found the People to have established beyond a reasonable doubt the voluntariness of defendant and his mother's consent to turn over defendant's pants to the police. We affirm.

Defendant argues, *inter alia,* that since the People concede the absence of probable cause to arrest him prior to the making of the videotaped statement, and given the particular circumstances of the case, his statements to the police constitute the fruit of an illegal custodial interrogation and are thus inadmissible, having been adduced in violation of the Fourth Amendment's requirement of probable cause (citing *Dunaway v New York,* 442 US 200) and the mere furnishing of *Miranda* warnings cannot serve to dissipate the taint of such an illegal custodial detention (see *Brown v Illinois,* 422 US 590).

It is well settled that whether a defendant was in police custody and was therefore not free to go is not determined by the individual defendant's subjective beliefs; rather, the determinative test is "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position" (*People v Yukl,* 25 NY2d 585, 589, cert den 400 US 851; see *Matter of Kwok T.,* 43 NY2d 213, 219-220). Further, in reviewing the hearing court's findings that there existed no custodial interrogation and that proffered statements were voluntarily made, the hearing court must be afforded great deference (*People v Yukl,* 25 NY2d 585, 588, *supra*) because it had the opportunity to see and hear the witnesses (see *People v Prochilo,* 41 NY2d 759, 761). Issues of credibility are primarily to be determined by the hearing court (*People v Armstead,* 98 AD2d 726), and, in the event the proof permits the drawing of conflicting inferences, the choice is for the trier of the facts and should be upheld unless unsupported by the evidence (*People v Vail,* 90 AD2d 917, 918; see *People v Leonti,* 18 NY2d 384, 390, cert den 389 US 1007).

Applying these principles to the case before us, it becomes clear that defendant's statements to the police were not the product of a custodial interrogation. The inquiry by the lone plain-clothes officer, Detective Meyers, at the hospital and his subsequent accompanying of defendant and his mother to the scene where defendant claimed he had been accosted, the latter location being one block from defendant's home, was, given defendant's behavior, which cannot be characterized as other

than consistent with that of a victim, clearly in the nature of investigatory police work rather than conduct consistent with the taking of a suspect into custody (*People v Yukl, supra; People v Winchell,* 98 AD2d 838, 839; see *People v Yanus,* 92 AD2d 674). Further, inasmuch as defendant's mother admittedly accompanied defendant to the hospital, was present when Detective Meyers arrived at that institution and accompanied the officer and her son to the site of the alleged attempted robbery and the precinct, it cannot be said that the police engaged in a pattern of conduct designed to isolate defendant from his family (cf. *People v Fuschino,* 59 NY2d 91, 100). Moreover, the fact that defendant was given his *Miranda* rights negated any possibility that defendant was of the view that he was obligated to speak to Detective Meyers; the fact that he was given his *Miranda* rights does not preclude a finding that a reasonable man in defendant's position, innocent of any crime, would have thought he was free to leave (see *People v Torres,* 97 AD2d 802, 804; *People v Ribble,* 77 AD2d 814). Accordingly, we conclude that defendant was not in custody at the hospital or when he was accompanied to DeKalb and Kent Avenues.

Turning to the events at the 88th Precinct, we conclude that up until the time defendant furnished the police with inconsistent and increasingly inculpatory statements, he was not in custody. The locale of the interview is but one factor to be weighed in considering whether an individual is in a custodial situation (*People v Yukl,* 25 NY2d 585, 589, *supra; People v Torres,* 97 AD2d 802, 804, *supra;* see *People v Liccione,* 63 AD2d 305, 315, affd 50 NY2d 850) and here, there is no indication in the record that defendant was deprived of his freedom in any significant way (see *Oregon v Mathiason,* 429 US 492). While defendant was not advised that he could refuse Meyers' request that he accompany that officer to the precinct, it suffices that defendant not be under a belief that no such right existed (*People v Joynes,* 72 AD2d 799). The record is bereft of any indication that defendant was reluctant to accompany Detective Meyers to the precinct or talk to the police in general; he was not restrained by physical or other means which would warrant a conclusion by a reasonable man in defendant's position that he would have been detained should he ask to leave (*People v Ribble,* 77 AD2d 814, 815, *supra;* cf. *Dunaway v New York,* 442 US 200, 212, *supra*). Defendant was not in the presence of Detective Meyers for an inordinate period of time; he was not overwhelmed by police presence at the precinct; while of relatively tender years, he was not deprived of parental companionship or food; the precinct was situated approximately a block away from his home and his conduct was consistent with that of

an individual assisting the police in their investigations. Accordingly, it cannot be said, as a matter of law, that an individual in defendant's position would have reasonably considered himself in custody when he went to the precinct and while he was giving statements to Detectives Meyers and Lehman (*People v Yukl, supra; People v Winchell,* 98 AD2d 838, *supra; People v Mertens,* 97 AD2d 595; *People v Ellis,* 83 AD2d 652; *People v Korsing,* 71 AD2d 628). Of course, there clearly existed probable cause to arrest defendant once he had furnished the police with conflicting inculpatory statements (see *People v Mertens,* 97 AD2d 595, *supra; People v Yanus,* 92 AD2d 674, *supra*), and his subsequent videotaped statement, made after being readvised of his *Miranda* rights and waiving those rights, was properly held admissible.

Further, based upon the totality of the circumstances, it is evident that the People sustained their heavy burden of demonstrating that defendant freely and voluntarily consented to turn over his previously worn trousers to Detective Meyers (see *Schneckloth v Bustamonte,* 412 US 218, 248; *People v Springer,* 92 AD2d 209, 212-213). Defendant was not in custody at the time he offered such cooperation; rather, his conduct constituted part of a continuing pattern of assistance to the police. Most significantly, defendant, accompanied by his mother, secured and tendered the subject garment without the assistance or presence of the lone Detective Meyers, who waited at the apartment door while defendant and his mother retrieved the garment (see *People v Gonzalez,* 39 NY2d 122; *People v Springer,* 92 AD2d 209, *supra*).

For the foregoing reasons, defendant's motion to suppress was properly denied in all respects. Lazer, J. P., Brown, Boyers and Eiber, JJ., concur.